UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

TAMEKA SIMMONS,

Plaintiff,

              v.                                            10cv8990 (JSR) (RLE)

AKIN GUMP STRAUSS HAUER & FELD LLP,

              Defendant.

----------------------------------------------------------------x

**DEFENDANT'S MEMORANDUM OF LAW
<u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

PILLSBURY WINTHROP SHAW PITTMAN LLP

2300 N St., N.W.
Washington, D.C. 20037
Telephone: (202) 663-8000
Facsimile:  (202) 663-8007
&
1540 Broadway
New York, New York 10036
Telephone: (212) 858-1000
Fax: (212) 858-1500

*Attorneys for Defendant
Akin Gump Strauss Hauer & Feld LLP*

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................. 2

III. ARGUMENT ..................................................................................................... 7

    A.  Ms. Simmons' Claims That She Was Terminated Based on Her Race Must
    be Dismissed (Counts I, III, V, VII). ................................................................. 7

        1.  Ms. Simmons cannot establish a prima facie case. ................................. 9

            a.  Alleged broken promises made during her recruitment. ...................... 11
            b.  The assignment to work with Mr. Gorman-Evans. ............................... 13
            c.  Other alleged stray and innocent remarks. ........................................... 15
            d.  Allegations about work assignments. ................................................... 16
            e.  Allegations regarding her reviews. ....................................................... 17
            f.  Attendance at diversity recruiting events. ............................................ 18
            g.  The allegation that she was the only African American female
               in the New York Office. ........................................................................ 19

        2.  Akin Gump has a legitimate nondiscriminatory reason for Ms. Simmons'
            termination: The Economy. .................................................................... 20

        3.  Ms. Simmons has no evidence of pretext. ............................................. 21

    B.  Ms. Simmons' FMLA Leave Claim Must Be Dismissed (Count IX). ............ 22

        1.  Ms. Simmons can not establish a prima facie case. ................................ 23

        2.  There is a legitimate nondiscriminatory reason for Ms. Simmons'
            termination and Ms. Simmons has no evidence of pretext. ...................... 24

IV. CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

**Page**

*Alam v. HSBC Bank USA, N.A.,* No. 07 Civ. 3540(LTS)(JCF), 2009 WL 3096293
    (S.D.N.Y. Sept. 28, 2009) ................................................................................22

*Blake v. Bronx Lebanon Hosp. Ctr.,* No. 02 Civ. 3827(DAB), 2007 WL 2981465
    (S.D.N.Y. Oct. 10, 2007)..................................................................................21

*Bonnano v. Verizon New York, Inc.,* No. 06 Civ. 6671 (DAB), 2011 WL 832855
    (S.D.N.Y. Mar. 4, 2011).....................................................................................8

*Bussey v. Phillips,* 419 F. Supp. 2d 569 (S.D.N.Y. 2006) ................................................19

*Chukwurah v. Stop & Shop Supermarket Co. LLC,* 354 F. App'x 492 (2d Cir. 2009) .................12

*Drake v. Delta Air Lines, Inc.,* No. 94-CV-5944(FB)(RML), 2005 WL 1743816
    (E.D.N.Y. July 21, 2005) ..................................................................................19

*Ford v. N.Y. City Dep't of Health & Mental Hygiene,* 545 F. Supp. 2d 377
    (S.D.N.Y. 2008) ................................................................................................15

*Grady v. Affiliated Cent., Inc.,* 130 F.3d 553 (2d Cir. 1997) ..........................................10

*Hudson v. Int'l Bus. Machs. Corp.,* 620 F.2d 351 (2d Cir. 1980)....................................19

*Hyek v. Field Support Servs., Inc.,* 702 F. Supp. 2d 84 (E.D.N.Y. 2010) ......................10

*Jowers v. Family Dollar Stores, Inc.,* No. 09 Civ. 2620(WHP), 2010 WL 3528978
    (S.D.N.Y. Aug. 16, 2010) ...............................................................................14

*Kolesnikow v. Hudson Valley Hosp. Ctr.,* 622 F. Supp. 2d 98 (S.D.N.Y. 2009)....................14-15

*Lawson v. N.Y. City Bd. of Educ.,* No. 05 Civ. 825(JSR)(HBP), 2011 WL 869282
    (S.D.N.Y. Feb. 25, 2011) ...................................................................................8

*LeBeoeuf v. N.Y.  Univ. Med. Ctr.,* No. 98 CIV. 0973(JSM), 2000 WL 1863762
    (S.D.N.Y. Dec. 20, 2000)..................................................................................24

*Lee v. Poughkeepsie City Sch. Dist.,* No. 06-CV-4660 (KMK), 2008 WL 852790
    (S.D.N.Y. Mar. 31, 2008)..................................................................................19

*Lu v. Chase Inv. Servs. Corp.,* No. 10-208-cv, 2011 WL 782226 (2d Cir. Mar. 8, 2011)..............8

*Martin v. Citibank, N.A.,* 762 F.2d 212 (2d Cir. 1985)....................................................19

*McFarlane v. Chao,* 04 Civ. 4871 (GBD)(HBP), 2007 U.S. Dist. LEXIS 991881
    (S.D.N.Y. Mar. 13, 2007)..............................................................................23, 24

*Meggison v. Paychex, Inc.,* 679 F. Supp. 2d 379 (W.D.N.Y.  2010)............................................23

*Memnon v. Clifford Chance US LLP*, 667 F. Supp. 2d 334 (S.D.N.Y. 2009) ...............................11

*Moses v. City of New York*, No. 06 CV 5974 (JSR), 2007 WL 2600859
    (S.D.N.Y. Aug. 28, 2007) ......................................................................................12

*Potenza v. City of New York*, 365 F.3d 165 (2d Cir. 2004) ......................................................23

*Price v. Mount Sinai Hosp.*, No. 07 CV 11318 (BSJ)(MHD), 2010 WL 4910218
    (S.D.N.Y. Nov. 23, 2010) ........................................................................... 7, 19-20

*Ragin v. E. Ramapo Cent. Sch. Dist.*, 05 Civ. 6496 (PGG), 2010 WL 1326779
    (S.D.N.Y. Mar. 31, 2010) ...............................................................................7, 9, 10

*Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524 (S.D.N.Y. 2009) ......................................................23

*Robles v. Argonaut Rest. & Diner, Inc.*, No. 05 CV 5553(JSR), 2009 WL 3320858
    (S.D.N.Y. Oct. 9, 2009) ...........................................................................................8

*Rodriguez v. Canyon Club*, No. 95 CIV. 6381 (JSR), 1997 WL 297056
    (S.D.N.Y. June 4, 1997) ...................................................................................... 7-8

*Ruth v. Infonet Servs. Corp.*, No. 94 Civ. 5576 (JSM), 1997 WL 189038
    (S.D.N.Y. Apr. 17, 1997) .........................................................................................21

*Simon v. Turner*,  No. 94 CIV. 8446(JSR), 1997 WL 151486 (S.D.N.Y. Apr. 1, 1997)...............20

*Sista v. CDC IXIS N. Am., Inc.*, 445 F.3d 161 (2d Cir. 2006).........................................................23

*Thomas v. Euro RSCG Life*, 739 F. Supp. 2d 630 (S.D.N.Y. 2010)...............................................23

*Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F. Supp. 2d 249 (E.D.N.Y. 1999) ...........13, 14

*Tomasino v. St. John's Univ.*, 08-CV-2059 (JG)(ALC), 2010 WL 3721047
    (E.D.N.Y. Sept. 23, 2010) .......................................................................................14

*Woodard v. TWC Media Solutions, Inc.*, No. 09-cv-3000 (BSJ)(AJP), 2011 WL 70386
    (S.D.N.Y. Jan. 4, 2011) ...........................................................................................8

*Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552 (S.D.N.Y. 2005) .................................7, 15

## STATUTES

Section 1981 of the Civil Rights Act of 1866,
    42 U.S.C. § 1981 .....................................................................................................1

Title VII of the Civil Rights Act of 1964,
    42 U.S.C. §§ 2000e *et seq.* ....................................................................................1

Family and Medical Leave Act of 1993,
    29 U.S.C. §§ 2601 *et seq.* .....................................................................................1
    29 U.S.C. § 2612(a)(1) ..........................................................................................22

New York State Human Rights Law,
    Executive Law §§ 296 *et seq.*..............................................................................................1

Administrative Code of the City of New York §§ 8-101 *et seq.* ....................................................1

## OTHER AUTHORITIES

Karen Sloan, *Where Have All the Flowers Gone? The Financial Crisis Knocked Great
    Cracks in the Legal Industry's Foundations*, National Law Journal, Dec. 21, 2009 ..........20

402804029v3

## I.       INTRODUCTION

Defendant Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") submits this Memorandum of Law in Support of its Motion for Summary Judgment on Plaintiff Tameka Simmons' race discrimination claims pursuant to Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; the New York State Human Rights Law, Executive Law §§ 296 *et seq.*; and the Administrative Code of the City of New York §§ 8-101 *et seq.* (Amended Complaint Counts I, III, V, and VII) and her claim pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* (Count IX).[1]

Ms. Simmons' lengthy Amended Complaint omits a critical and undisputed set of facts, which end her case.  She was hired in mid-2007 as a junior associate (with less than two years of experience) into Akin Gump's Investment Funds Practice Group ("IFPG"), which was in "tremendous demand" for services.  She had no experience in the area, but Akin Gump offered, and she attended, at least twenty-two (22) substantive training sessions at Akin Gump, and she worked with some of the IFPG's most experienced partners on matters for significant IFPG clients.  Her performance was not as strong as the IFPG partners hoped or expected, but another force overpowered her and the entire IFPG – the economic crisis that began in September 2008, which reduced substantially work for attorneys in that group.  By December 31, 2009, Akin Gump had laid off twelve (12) IFPG associates and counsel and dozens of attorneys firm-wide.

The undisputed evidence is that Akin Gump hired Ms. Simmons enthusiastically, trained her as it did other lateral associates in the IFPG, and made special efforts to retain her when it let Causcasian associates go in a formal RIF in March 2009, even when faced with a startling

---

[1]  On February 2, 2011, the Court dismissed Counts II, IV, VI, and VIII.

economic downturn.  Yet ultimately, in September 2009, after almost a dozen layoffs in the IFPG,

its Co-Chairman concluded "[o]ur practice was continuing to experience precipitous declines . . .

we still had excess capacity and needed to take more steps to reduce our capacity."  Ms. Simmons

was, accordingly, told she would be terminated effective December 31, 2009.  These and other

undisputed facts, as well as the controlling law, support summary judgment for Akin Gump on the

remaining counts in the Amended Complaint.

## II.    FACTUAL BACKGROUND

A summary of the undisputed material facts is presented here.  The complete Statement of

Undisputed Material Facts (the "Statement"), is filed separately and will be referenced throughout

this Memorandum.

Stephen Vine and Prakash Mehta are the Co-Chairmen of Akin Gump's IFPG.  (Statement

at ¶ 2).  In 2007, Mr. Vine and Mr. Mehta made the decision to hire eight lateral associates to the

New York office, including Ms. Simmons.  (*Id.* at ¶ 3).  Most, like her, had no prior investment

funds experience.  (*Id.* at ¶ 4).  Ms. Simmons, who had spent less than two years at a prior firm,

was recruited by Oluriyike Ojediran and Tia Breakley, two African American attorneys in the

IFPG with whom she had prior relationships.  (*Id.* at ¶¶ 1,5,6,9).  The feedback from the seven

partners who interviewed Ms. Simmons was "enormously positive."  (*Id.* at ¶ 7).  Indeed, the firm

elected to pay her as a 2005 graduate despite her lack of investment funds experience, and a full

2007 bonus, despite her mid-year start date.  (*Id.* at ¶ 9).

At the recommendation of Ms. Breakley, Ms. Simmons was immediately given a "plum

assignment" supervised by a partner in London, who is described as "one of the most gifted funds

lawyers" and "one of the best teachers," although quite demanding.  (Statement at ¶¶ 11-13).

Another lateral associate, Shelia Sharifi-Azad (Caucasian) was also assigned to that project.  (*Id.*

at ¶ 11).  (*Id.* at ¶¶ 10,16).  In her first month, Ms. Simmons requested a Partner Mentor and was

2

assigned Ann Tadajweski, whom Ms. Simmons considered an "expert" in the field.  (*Id.* at ¶ 17).

In addition, the IFPG offered formal training to its associates and Ms. Simmons attended at least

twenty-two (22) programs.  (*Id.* at ¶ 20).

Ms. Simmons reported to individuals both inside and outside the firm that she was

receiving training and mentoring and was happy at the firm.  (Statement at ¶¶ 24,30,31,37).

Indeed, she wrote to one friend that her switch to Akin Gump was the "BEST thing that could

have ever happened[.]"  (*Id.* at ¶ 31).  She told her friends and even her own mother that she was

"enjoying New York more since the job switch" so much so that her alleged plan to move to

Washington, D.C. to join her fiancé (now husband) was postponed "indefinitely" and put on

"hold."  (*Id.* at ¶ 31,37).

Shortly after Ms. Simmons' arrival, however, partners began noticing deficiencies in her

performance.  (Statement at ¶¶ 15,23,28).  Various partners expressed that she was "careless and

unfocused," "unresponsive," and lacked strong analytical and drafting skills.  (*Id.*).  Ms. Simmons

also turned down a project from Mr. Vine during 2008, which was surprising to Ms. Tadajweski,

because "it's not very common to have a conversation about not wanting to do work with the head

of the group[.]"  (*Id.* at ¶ 36).  In preparing Ms. Simmons' 2008 review, partner Arina Lekhel told

Ms. Tadajweski that she did not want to be "too harsh," but that "I don't want to sound like there

are no issues."  (*Id.* at ¶ 39).  Ms. Simmons' 2008 written performance review indicated she

"Needs Development" in multiple substantive areas; no New York IFPG associate had more

substantive areas of concern.  (*Id.* at ¶ 48).  In October 2008, Mr. Vine and Mr. Mehta identified

Ms. Simmons to Kim Koopersmith, the firm's Managing Partner, as one of three associates in the

IFPG who "need[ed] improvement."  (*Id.* at ¶ 42 ).  The two others were Caucasian. (*Id.*).

From June 11 through June 25, 2008, Ms. Simmons was out of the office for her wedding

and honeymoon.  (Statement at ¶ 33).  She was then out on FMLA leave from July 24, 2008

3

through September 5, 2008. (*Id.* at ¶ 34). The firm gave Ms. Simmons all the FMLA leave she requested; paid her every day that she was out of the office (although not legally required to do so); and no one from the firm ever told her during her FMLA leave that they were unhappy about her being on leave. (*Id.*). She also had work waiting for her upon her return. (*Id.*). In addition, the firm annualized her 2008 billable hours to account for her FMLA leave (again, despite not being required to legally do so) and paid Ms. Simmons the full New York market bonus of $22,500.00 for 2008, which she would have otherwise not been entitled to receive based on her hours. (*Id.* at ¶ 56). From December 5 through 12, 2008, Ms. Simmons was out of the office to be with her brother in Atlanta, who had a medical emergency. (*Id.* at ¶¶ 43-46).

Mr. Vine and Ms. Tadajweski conducted Ms. Simmons' performance review meeting in January 2009. (Statement at ¶ 51). After this review, Mr. Vine told New York IFPG partners "to do a better job at integrating Tameka into the group…and he also said to the extent that you have work, please consider Tameka." (*Id.* at ¶ 53). Mr. Vine also made a specific request to Ms. Lekhel individually that she "keep working with Tameka" and get her involved. (*Id.*). Mr. Vine was himself working with Ms. Simmons at the time, and, at least once, specifically thanked Ms. Lekhel "for spending time with Tameka," when Ms. Simmons had misunderstood an assignment. (*Id.* at ¶ 54).

On September 15, 2008, Lehman Brothers had collapsed with a devastating impact on the investment funds industry. (Statement at ¶ 38). Within a month, Mr. Vine and Mr. Mehta began laying off counsel and associates from the IFPG, beginning with an attorney (Caucasian) who had just been hired as a counsel in the Los Angeles IFPG a few months prior. (*Id.* at ¶¶ 35,38,41). Within a few months, Mr. Mehta had also alerted two associates (one Caucasian and one African American), in the D.C. IFPG, that they would need to leave the firm. (*Id.* at ¶ 57). In February 2009, Akin Gump began a formal firm-wide RIF process. (*Id.* at ¶ 58). Mr. Vine and Mr. Mehta

selected three associates from the New York IFPG to be included in the firm-wide RIF – John Lore and Charles Sirianni (both Caucasian) and Ms. Simmons.  (*Id.*).  Mr. Vine then removed Ms. Simmons from the list, in part to retain diversity in the group; he testified, "We hoped that there would be an improvement in volume of work flow in to the group and an improvement in her skill levels to warrant retaining her on a permanent basis."  (*Id.*).  Mr. Mehta deferred to Mr. Vine's decision, though he did not agree, in light of the need to "appropriately size [the] group."  (*Id.*).  Ms. Koopersmith also questioned the choice of "Siriani Rather than simonds [sic]," because she had received the email five months earlier about Ms. Simmons' weak performance.  (*Id.* at ¶ 59).

On March 6, 2009, Akin Gump laid off 47 attorneys firm-wide – including seven IFPG associates, (five Caucasian males, one Caucasian woman, and one Asian woman), including Mr. Lore and Mr. Sirianni, in New York.  (Statement at ¶ 60).  Ms. Simmons was not included.  (*Id.*).

The spring of 2009 continued to be a challenging time for the firm as a whole and, in particular, for the IFPG.  (Statement at ¶ 61).  In April, the firm announced that it was deferring the start dates for incoming associates in certain practice groups; the New York IFPG incoming associates were deferred to the last possible start date in March 2010.  (*Id.* at ¶ 62).  The partners, including Mr. Mehta, Ms. Lekhel, and Ms. Tadajweski, had concerns regarding their job security.  (*Id.* at ¶ 61).

From June 26, 2009 through July 20, 2009, Ms. Simmons went on a three-week vacation to South Africa.  (Statement at ¶ 64).  The prior fall, upon receiving notice of this vacation, Ms. Tadajweski remarked to fellow partners in the IFPG: "This is kind of an amazing request after I had a conversation with her yesterday about needing to be in the office and available to get work experience."  (*Id.* at ¶ 40).  While Ms. Simmons was on vacation, she learned that the firm's Chairman reported that the IFPG, in particular, was "really lagging in terms of billables" and that

5

he intended to discuss that issue with Mr. Vine and Mr. Mehta in July.  (*Id.* at ¶ 64).  In July 2009,

Mr. Mehta and a partner in the Dallas IFPG, made the decision to remove an associate (Caucasian)

in the Dallas IFPG from the payroll.  (*Id.* at ¶ 66).

In September 2009, Mr. Mehta moved to New York to try to generate business for the

IFPG.  (Statement at ¶ 69).  He and Mr. Vine continued to be concerned regarding the declining

economic health of the group, and decided to terminate Ms. Simmons.  (*Id.* at ¶ 71).

> We had a year's worth of conversations about post-Lehman situation where we are
> and you've heard the story now about Elfenbein through the RIF, through Tim
> Kerndt [sic] and Nicole Lanteri, now we're in the summer 2009 and
> notwithstanding all the actions we've taken Steven [sic] and I have discussed our
> numbers still have not rallied, somewhat shockingly, that would you eliminate this
> many people for economic reasons, all the other groups as far as I could tell that
> eliminated people, their numbers rallied in terms of average billable hours per
> lawyer, which is what you would expect would happen.  If you terminate lawyers
> and a large number of lawyers the work you have is spread out over a fewer
> number of lawyers and your average hours per lawyer should go up, and this had
> happened in many other groups, but in my group generally speaking, it had not
> occurred.  Our numbers were just about still where they were overall six and nine
> months before.  So I said Steve, we didn't – we didn't go deep enough, in so many
> words, and so Steve now, unless – unless you think otherwise, I think as horrible as
> it is we have to let Tameka know that we don't think we can keep for economic
> reasons.

(*Id.*).

Mr. Mehta and Mr. Vine were advised by the Akin Gump Human Resources Manager in

New York to treat Ms. Simmons exactly like the other attorneys laid off in March 2009, with a

three month severance, release, and immediate removal from the office.  (Statement at ¶ 73).

They resisted, to get her what they viewed as a better offer and opportunity to stay with the firm

through yearend.  (*Id.*).  On September 17, 2009, Mr. Mehta and Mr. Barth informed Ms.

Simmons that her employment at the firm would be terminated as of December 31, 2009, for

economic reasons.  (*Id.* at ¶ 75).  The IFPG revenue for 2009 was 26% less than 2008, and, despite

the deep layoffs, the IFPG average annual billable hours were 14% less than 2008.  (*Id.* at ¶ 83).

6

## III.    ARGUMENT

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases, and that the salutary purposes of summary judgment-avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation.  As in any other case, an employment discrimination plaintiff faced with a properly supported summary judgment motion must do more than simply show that there is some metaphysical doubt as to the material facts . . . . She must come forth with evidence sufficient to allow a reasonable jury to find in her favor."  *Ragin v. E. Ramapo Cent. Sch. Dist.*, No. 05 Civ. 6496 (PGG), 2010 WL 1326779, at *6 (S.D.N.Y. Mar. 31, 2010) (granting summary judgment to employer in race discrimination case) (internal citation and quotations omitted).  "A defendant will be entitled to summary judgment unless the plaintiff 'can point to evidence that reasonably supports a finding of prohibited discrimination.'"  *Price v. Mount Sinai Hosp.*, No. 07 CV 11318 (BSJ)(MHD), 2010 WL 4910218, at *2  (S.D.N.Y. Nov. 23, 2010) (granting employer's motion for summary judgment in race discrimination and FMLA case).  Particularly relevant to this case, "[m]ere conclusory statements, conjecture or speculation by the plaintiff will not defeat a summary motion."  *Ragin*, 2010 WL 1326779, at *6*; see also Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 560 (S.D.N.Y. 2005) (granting motion for summary judgment in a race discrimination case).

### A.    Ms. Simmons' Claims That She Was Terminated Based on Her Race Must be Dismissed (Counts I, III, V, VII).

To establish a prima facie case of discriminatory discharge, Ms. Simmons must show that (1) she belongs to a protected class, (2) she was performing her duties satisfactorily, (3) she was discharged, and (4) her discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class.  *Rodriguez v. Canyon Club*, No. 95

7

CIV. 6381 (JSR), 1997 WL 297056, at *1 (S.D.N.Y. June 4, 1997) (Rakoff, J.) (granting summary

judgment for employer because employee was not discharged under circumstances giving rise to

an inference of racial discrimination and therefore could not meet his prima facie burden).  If a

plaintiff establishes a prima facie case,

> the burden shifts to the defendant to put forward a legitimate, non-discriminatory
> justification.  If such a justification is advanced, the burden shifts back to plaintiff
> to adduce sufficient evidence that the justification is a pretext for discriminatory
> animus.  Once the prima facie case is overcome, the presumptions under the
> McDonnell Douglas framework fall by the wayside, and plaintiff must then adduce
> sufficient evidence that reasonably supports an inference of discrimination . . . .
> Hence, evidence that suggests that defendant's proferred justification may be
> pretextual is not necessarily sufficient to defeat a motion for summary judgment;
> rather, plaintiff must adduce competent evidence to sustain a finding of
> discrimination . . . .That is, plaintiff must show that the defendant's employment
> decision was more likely than not based in whole or in part on discrimination.

*Robles v. Argonaut Rest. & Diner, Inc.*, No. 05 CV 5553(JSR), 2009 WL 3320858, at *4

(S.D.N.Y. Oct. 9, 2009) (Rakoff, J.) (granting summary judgment on Title VII claims) (internal

citations and quotations omitted).[2]

---

[2]  The same framework applies to claims under Title VII, Section 1981, the Human Rights Law,
and the City Law.  *See, e.g. Lu v. Chase Inv. Servs. Corp.*, No. 10-208-cv, 2011 WL 782226, at
*6 (2d Cir. Mar. 8, 2011) ("[Plaintiff's] claims pursuant to [Section 1981] are analyzed under
the same *McDonnell Douglas* burden-shifting framework as her Title VII claims . . .The same is
true for [Plaintiff's Human Rights Law and City Law] claims . . . .");  *Lawson v. N.Y. City Bd. of
Educ.*, No. 05 Civ. 825(JSR)(HBP), 2011 WL 869282, at *16 (S.D.N.Y. Feb. 25, 2011) (Report
and Recommendation of Magis. Judge Pitman adopted by J. Rakoff on 3/18/11) ("[V]iolation[s]
of Title VII, Sections 1981 and 1983, the [Human Rights Law] and the [City Law] all require
proof of the same elements and can, therefore, be analyzed collectively.").  There is some case
law suggesting that courts must apply an independent analysis to disparate treatment claims
under the City Law.  *See, e.g. Woodard v. TWC Media Solutions, Inc.*, No. 09-cv-3000
(BSJ)(AJP), 2011 WL 70386, at *9 (S.D.N.Y. Jan. 4, 2011) ("The independent analysis
[required by the City Law] must be targeted to understanding and fulfilling the [City Law's]
uniquely broad and remedial purposes, which go beyond those of counterpart state or federal
civil rights laws.") (internal citation and quotations omitted).  However, "[d]espite this
[independent analysis], the [City Law] does not alter the kind, quality or nature of evidence that
is necessary to support or defeat a motion for summary judgment under Rule 56."  *Bonnano v.
Verizon New York, Inc.*, No. 06 Civ. 6671 (DAB), 2011 WL 832855, at *7 (S.D.N.Y. Mar. 4,
2011) (internal citation and quotations omitted).

1.     Ms. Simmons cannot establish a prima facie case.

Ms. Simmons cannot establish that she was terminated under circumstances giving rise to an inference of discriminatory intent.  The inference of discriminatory intent "may be derived from a variety of circumstances." *Ragin*, 2010 WL 1326779, at *11 (internal citations and quotations omitted).  However, the "critical question" is "whether those involved in the decision to terminate [plaintiff's] employment . . . acted with discriminatory animus." *Id.* at **12-13 (granting summary judgment on employee's Title VII race discrimination claim because the employee failed to offer any evidence "raising an inference of discriminatory intent on the part of those who made the decision to terminate her employment").

As a preliminary matter, Ms. Simmons never complained to anyone that she felt she was being discriminated against on the basis of race.  (Statement at ¶ 77).  Rather,

- In November 2007, Ms. Tadajweski reported to Mr. Vine that she had heard "repeatedly" from Ms. Simmons "how happy [she was] working in our group"

- On January 14, 2008, Ms. Simmons told Ms. Tadajweski: "[I] appreciate you taking the time to get me on board and integrate me into the client and practice, thank you.  I really like recruiting, especially when I like my job.  I think it's a really nice way to remind yourself of what its you like about your practice, the firm and the people – a nice pick me up."

- On February 6, 2008, Ms. Simmons wrote that she was "very excited about Akin recruiting at Howard and [was] happy to not only attend but assist in planning any recruiting efforts going forward."

- On March 14, 2008, Ms. Simmons wrote a friend:  "All is well here – enjoying New York more since the job switch."

- On March 24, 2008, she wrote to another friend that "NY is not that bad once you get used to it and to be honest, I'm having so much fun that we've postponed our move until … whenever."

- On May 22, 2008, she wrote to another friend: "I left my first firm after a couple of years because a friend called up and they had someone who wanted to meet me at my new firm.  At the time, I was not looking for a job, but looking back it was the BEST thing that could have ever happened to me – they were trying to kill me."

- On June 4, 2009, Ms. Simmons told Ms. Beckler-Knoll that she was "Happy to attend!" a diversity event for the firm.

9

(*Id.* at ¶¶ 24,30,31,63).

Equally important, it is undisputed that Mr. Vine and Mr. Mehta made the decision to hire Ms. Simmons in June 2007 and made the decision to notify her in September 2009 that her employment would be terminated as of the end of December 2009.  (Statement at ¶¶ 7,71).  The "same actor inference" provides an inference that discrimination was not a motivating factor in their decision.  *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire."); *Ragin*, 2010 WL 1326779, at *13 (noting that the same actor inference was a "highly relevant" factor where two years and four months elapsed between hiring and firing); *Hyek v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 101-02 (E.D.N.Y. 2010) (finding that the same actor inference remained significant when plaintiff's termination occurred ten months after Plaintiff's last salary increase and two years and eight months after Plaintiff's last promotion).

It is also undisputed that Mr. Vine made the decision to remove Ms. Simmons from the March 2009 RIF list and, then, specifically instructed the New York IFPG partners to better integrate her into the group and consider her for work assignments.  (Statement at ¶¶ 53,58).  Further, Mr. Vine himself worked with Ms. Simmons, despite the fact that she had previously turned down an assignment for him.  (*Id.* at ¶ 54).  With respect to Mr. Mehta, who was named one of the 50 most influential minority lawyers in America by the National Law Journal in 2008 (*Id.* at ¶ 2), even Ms. Simmons cannot identify any conduct from which a discriminatory animus could be gleaned.[3]

---

[3]  Ms. Simmons claims Mr. Mehta ignored her in the Spring 2009, when he visited New York. Even if true, he was understandably distracted with concern about the group's job security at the time.  (Statement at ¶ 61).

Finally, Ms. Simmons' contention that "every" partner in the New York IFPG discriminated against her and that, essentially, everything that happened to her at Akin Gump was racially motivated does not help her.[4]

        a.      Alleged broken promises made during her recruitment.

Ms. Simmons claims that she was promised a transfer to Akin Gump's Washington, D.C. office during her recruitment, but was never transferred.  It is undisputed that (1) there was no formal agreement between Ms. Simmons and Akin Gump regarding a transfer to D.C. and such an "agreement" is not stated in her offer letter, (2) she told her friends and even her own mother that her move to D.C. to join her husband was postponed "indefinitely" and put on "hold,"[5] (3) one of the most senior lawyers in D.C.'s IFPG, was so unhappy with Ms. Simmons work that she stopped giving her tasks, and (4) although Ms. Simmons' husband owned a home in D.C., she never picked a date on which to move to D.C. and she still has not moved to D.C. (Statement at ¶¶ 8,38,37).  More importantly, Ms. Simmons cannot point to a single attorney in the IFPG who was transferred from the New York to the D.C. office during her employment at the firm.  (*Id.* at ¶ 76).

Ms. Simmons also claims that during her recruitment she was promised training and mentoring, including specifically that she would be mentored by Ms. Breakley, who left Akin Gump shortly after she began her employment.  It is undisputed that Ms. Breakley, who was "one of our most capable lawyers in every aspect of lawyering," according to Mr. Vine, voluntarily left the firm.  (Statement at ¶¶ 6,11).  It is also undisputed that although Akin Gump does not provide

---

[4]  Akin Gump will not address in this Motion any claim regarding the governmental investigation described in paragraph 44 of the Amended Complaint because all claims regarding this investigation were dismissed by this Court on February 2, 2011.  In addition, post-employment actions do not constitute adverse actions for discrimination claims.  *See Memnon v. Clifford Chance US LLP*, 667 F. Supp. 2d 334, 342 (S.D.N.Y. 2009).

[5]  At her deposition, Ms. Simmons testified that she was lying when she made the statements to her friends and her mother.  (Statement at fn 9).

mentors to lateral associates, Akin Gump assigned Ms. Tadajweski as a Partner Mentor to Ms. Simmons, who Ms. Simmons describes as an "expert" in investment funds work.  (*Id.* at ¶ 17). In addition, the undisputed record demonstrates that both Ms. Tadajweski and Ms. Lekhel offered guidance and training to Ms. Simmons during her employment at the firm, and Mr. Vine specifically thanked Ms. Lekhel for doing so.  (*Id.* at ¶¶ 18,19,24,30,53,54).  According to Ms. Simmons, there was only one partner (Ms. Lekhel) who "on occasion" did not provide guidance in response to her requests.  (*Id.* at ¶ 21).  Further, Ms. Simmons attended formal funds training at Akin Gump and admits that she was never denied any internal or external formal training opportunity, nor access to treatises and models.  (*Id.* at ¶¶ 20-21).

There is simply no evidence of training, resources, or mentorship that similarly situated employees outside of her protected class received that she did not.  *See Chukwurah v. Stop & Shop Supermarket Co. LLC*, 354 F. App'x 492, 495 (2d Cir. 2009) (affirming summary judgment, where plaintiff had offered "no evidence, apart from his own opinion, that similarly situated employees outside a protected class received more training"); *Moses v. City of New York*, No. 06 CV 5974 (JSR), 2007 WL 2600859, at *1 (S.D.N.Y. Aug. 28, 2007) (Rakoff, J.) ("Plaintiff has introduced nothing-aside from her own dissatisfaction with the training and instruction that she received-to call the many criticisms and complaints concerning her work performance into question.  The fact that plaintiff may not have received satisfactory guidance does not, in and of itself, suggest that defendants' proferred reasons for adverse action are a pretext for discrimination.  The anti-discrimination laws do not require defendants to be good managers; they require only that defendants not discriminate on the basis of a protected status.")

b.      The assignment to work with Mr. Gorman-Evans.

Ms. Simmons claims that her assignment to work under the supervision of Mr. Gorman-Evans, a "notoriously difficult partner" (Amended Complaint at ¶ 21) in the London office, was discrimination, as was his treatment of her.  She is wrong.

First, Ms. Simmons was assigned to this project at the recommendation of Ms. Breakley, who also worked on the project.   Ms. Breakley told Ms. Simmons she had experienced no issues "as an African American woman at the firm."  (Statement at ¶ 6).  Second, this was considered a "plum assignment," by Mr. Vine himself.  (*Id.* at ¶ 13).  Third, Mr. Gorman-Evans is described by his colleagues as "one of the most gifted funds lawyers", one of Akin Gump's "finest and most intelligent lawyers," one of Akin Gump's "most masterful draftsmen", and "one of the best teachers."  (*Id.* at ¶ 12).  Fourth, other associates were assigned to this project including Ms. Sharifi-Azad (Caucasian).  (*Id.* at ¶ 11).  Fifth, within a week of beginning her employment at Akin Gump, Ms. Simmons was also assigned to projects for two other clients under the supervision of IFPG partners in the New York office.  (*Id.* at ¶¶ 10,16).  Accordingly, Ms. Simmons cannot establish any inference of race discrimination in her assignment.  *See Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F. Supp. 2d 249, 263 (E.D.N.Y. 1999) (granting summary judgment for employer on race discrimination claim where the record was devoid of evidence sufficient to support a finding that the plaintiff was assigned to teach a different class because of her race).

Ms. Simmons also has no evidence to support her allegation that Mr. Gorman-Evans subjected her to racially hostile treatment.  It is undisputed that other associates found Mr. Gorman-Evans difficult.  (Statement at ¶¶ 12-13).  In addition, Ms. Simmons admits that Mr. Gorman-Evans found it "really annoying" that <u>both</u> she and Ms. Sharifi-Azad were scheduled to be out of the office at the same time, and it is undisputed that Mr. Gorman-Evans expressed his

13

frustration regarding both of their absences to leaders of the IFPG.  (*Id.* at ¶ 22).  Further, it is undisputed that Ms. Simmons asked Mr. Gorman-Evans to introduce himself during his first visit to the New York office after she began working at Akin Gump, which he did.  (*Id.* at ¶ 25).  Ms. Simmons' never told anyone at Akin Gump that Mr. Gorman-Evans was discriminating against her despite her allegations that she complained about his demands one time to Ms. Tadajweski and Mr. Mehta.  (*Id.* at ¶ 27).

Mr. Gorman-Evans' alleged comments to Ms. Simmons (allegedly once that she was "lazy" and twice that she was "stupid") even if harsh and inappropriate, do not evince a discriminatory state of mind and are not evidence of discrimination.  *See Tomasino v. St. John's Univ.*, 08-CV-2059 (JG)(ALC), 2010 WL 3721047, at **5, 8 (E.D.N.Y. Sept. 23, 2010) (supervisor's comments that one employee was "lazy" and "incompetent", were not evidence of a "discriminatory state of mind" because "[n]one of the alleged remarks, even mention race, or any class of people at all; they are individualized criticism of a particular employee's intellect or ability"); *Ticali*, 41 F. Supp. 2d at 263 ("Title VII does not make employers liable for being mean or petty; it makes them liable for discriminating, for firing people or subjecting them to adverse employment determinations on account of their being a member of a protected class.").

Finally, Mr. Gorman-Evans was not involved in the termination decision, so allegations about him are irrelevant.  *See Jowers v. Family Dollar Stores, Inc.*, No. 09 Civ. 2620(WHP), 2010 WL 3528978, at **1, 3 (S.D.N.Y. Aug. 16, 2010) (store manager's singular statement that "black people are lazy and incompetent" was insufficient to establish an inference of discrimination because "[o]nly where decision-makers repeatedly make comments that draw a link between a plaintiff's membership in a protected class and an adverse employment action can an inference of discriminatory animus be drawn") (internal citation and quotations omitted); *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 114-15 (S.D.N.Y. 2009) (finding remarks "not at

14

all probative of whether the decision to terminate [plaintiff's] employment was motivated by discriminatory intent" because the comments had no relationship to the discriminatory behavior, there was no evidence that they were made close in time to the termination, or that they were condoned by any decision-maker).

> c.  Other alleged stray and innocent remarks.

Ms. Simmons claims that the following are evidence of race discrimination:  Ms. Lekhel told her that she would do well in non-profit work; Mr. Bruynes once confused her with their shared African American secretary; partner William Sturman discussed the Housewives of Atlanta with her, but did not give her work; Mr. Gorman-Evans and Mr. Bruynes each once called her "Tia," when she first started at Akin Gump; and when the press identified a Caucasian woman involved with Governor Spitzer, who had a name similar to hers, unidentified people made jokes, such as "I wondered about you."

Not a single one of these allegations is relevant to Ms. Simmons' claims of discriminatory discharge.  First, none of them have any racial content.  *See e.g., Ford v. N.Y. City Dep't of Health & Mental Hygiene*, 545 F. Supp. 2d 377, 389 (S.D.N.Y. 2008) (co-workers comments like "fat fish" and "stupid fish" were "not objectively indicative of gender animus").  Second, none of the partners were involved in the decision to terminate Ms. Simmons' employment.  As set forth above, it is "well settled that stray racial remarks made by persons not involved in making the adverse employment decision are not sufficient to establish an inference of discrimination."  *See Yarde*, 360 F. Supp. 2d at 560 (finding plaintiff failed to demonstrate an inference of discrimination where her supervisor called her a "black bitch" and told her to "go back from where [she] came from" because her supervisor was not involved in the decision to terminate her employment).

d.      Allegations about work assignments.

Ms. Simmons offers no evidence that she was treated differently with respect to work assignments.  She first complains that Ms. Tadajweski offered her an assignment that others had turned down as "undesirable, menial work," (Amended Complaint at 26), but it is undisputed that Ms. Ojediran recommended to Ms. Tadajweski that Ms. Simmons be assigned to this matter, (Statement at ¶ 26), and there is no evidence of anyone turning this work down.

Ms. Simmons also claims broadly that Akin Gump was "removing her from assignments and replacing her with White associates" after her 2008 performance review meeting.  (Amended Complaint at ¶ 35).  Ms. Simmons was only able to provide two examples of allegedly being replaced with a Caucasian associate.  (Statement at ¶ 68).  The first project was for Ms. Tadajweski.  It is undisputed that Ms. Simmons worked on this project in the fall of 2008, and after the initial work, the project lay dormant for almost six months.  (*Id.* at ¶ 67).  In the interim, the client asked that Ms. Tadajweski assign the matter to a more senior attorney.  (*Id.*).  Accordingly, as Ms. Simmons admitted at her deposition, Ms. Tadajweski explained to her that she assigned the matter to Marian Shin (Asian), a more senior associate.  (*Id.*).  There is no evidence that Ms. Sharifi-Azad replaced Ms. Simmons on this project, because she did not.  (*Id.*).  Ms. Tadajweski assigned Ms. Sharifi-Azad work on a <u>new</u> project for that client in 2009, because Ms. Sharifi-Azad "had previous experience in working with these types of assets."  (*Id.*).

Ms. Simmons also testified that in 2009, Mr. Kustin needed assistance for a project for a client for whom he and associate Shane Fleenor worked, while Mr. Fleenor was out of the office on a vacation.  (Statement at ¶ 68).  Ms. Simmons assisted Mr. Kustin, and when Mr. Fleenor returned, he took over the project.  (*Id.*).  That is it.

Finally, Ms. Simmons complains that no partner sent her work to do while she was with her brother, who had been in a "major accident" and was "in critical condition" in the hospital in

16

Atlanta.  (Statement at ¶¶ 43-45).  First, (not surprisingly) there is no evidence that any other associate who had a family emergency was given work while at a hospital.  Second, Ms. Simmons cannot identify a single partner who "refused" to provide her with work.  Rather the undisputed record demonstrates that Ms. Tadajweski contacted Ms. Simmons about work and later told Ms. Simmons that she would try to find "portable" work, after Ms. Simmons specifically requested something to distract her from the tragic situation.  (*Id.* at ¶¶ 43,45-46).

>           e.           Allegations regarding her reviews.

Ms. Simmons claims that it was "discriminatory" for her to not receive a written evaluation for 2007.  She then admits that no associate, like her, who had been at the firm for less than six months, received a written performance review in 2007.  (Statement at ¶ 29).

With respect to 2008 reviews, she received an informal mid-year review, a formal year-end written review from the partners she selected to complete her review, and a formal year-end oral review just like the other associates in the New York IFPG.  (Statement at ¶¶ 32,47,51).  Ms. Simmons' formal oral review was conducted by Mr. Vine and Ms. Tadajweski on January 5, 2009, after being rescheduled several times.  (*Id.* at ¶¶ 50-51).  Mr. Vine was forced to reschedule this review meeting due to client conflicts.  (*Id.* at ¶ 50).  Ms. Simmons herself could not attend a rescheduled meeting on December 5 (Amended Complaint at ¶ 30) because she was in Atlanta with her brother.  (*Id.* at ¶¶ 43-45).

It is also undisputed that Ms. Simmons received among the worst, if not the worst, 2008 performance review in the New York IFPG.  (Statement at ¶ 48).  Indeed, it is undisputed that Ms. Lekhel, one of Ms. Simmons' reviewers in 2008, believes hers was the worst review that she had ever given an associate.  (*Id.* at ¶ 39).  Ms. Lekhel even sent a draft of her review of Ms. Simmons to Ms. Tadajweski, in advance, asking: " Do you think this is too harsh?  (I am also done with 7 others but I am sort of concerned given her health and sensitivity; on the other hand, I don't want

17

to sound like there are no issues)." (*Id.*).  Ms. Tadajweski agreed that this was "definitely a hard one to do." (*Id.*).[6]

Ms. Simmons alleges that it was discriminatory that Ms. Lekhel was allegedly unable to provide her with specific examples of performance issues.  This is flawed, however, because there is no evidence that Ms. Lekhel gave anyone such examples.

Further, the comments made by Mr. Vine and Ms. Tadajweski during the review meeting were consistent with the criticisms of Ms. Simmons' work that had accumulated by that time.  For example, Mr. Gorman-Evans found her work "pathetic" on one occasion and often contained "inaccuracies" and "did not reflect enough care." (Statement at ¶ 15).  He, in fact, reached out to Ms. Tadajweski in November 2007 to ask if anyone else found Ms. Simmons "careless and unfocused." (*Id.*).  Ms. Lekhel found Ms. Simmons to lack strong analytical and drafting skills. (*Id.* at ¶ 23).  Ms. Hsu, a senior counsel in the D.C. IFPG, eventually refused to work with Ms. Simmons after she was consistently unresponsive to requests for critical documents. (*Id.* at ¶ 28).  Mr. Barth criticized her and she became upset. (*Id.* at ¶ 65).  By October 2008 the IFPG had identified Ms. Simmons as one of three associates who were not "performing at the necessary level." (*Id.* at ¶ 42).  The other two were Caucasian.

f.      Attendance at diversity recruiting events.

The undisputed record demonstrates that Ms. Simmons enjoyed attending recruiting and diversity events, and was never required to do so or punished when she declined.  For example, when the firm was recruiting at her alma mater, Howard Law School, Ms. Simmons wrote that she was "very excited about Akin recruiting at Howard" and that she was "happy to not only attend

---

[6]  Ms. Simmons alleges that it was discriminatory that Ms. Lekhel was allegedly unable to provide her with specific examples of performance issues.  This is flawed, however, because there is no evidence that Ms. Lekhel gave anyone such examples.

but assist in planning any recruiting efforts going forward." (Statement at ¶ 30). And as late as

June 2009, Ms. Simmons was "Happy to attend!" a diversity event for the firm. (*Id.* at ¶ 63). It is

undisputed that Ms. Simmons never told the Recruiting Department or an African American

corporate partner in New York who participated in many of these events with Ms. Simmons that

she was uncomfortable attending. (*Id.* at ¶ 55). When Ms. Simmons declined attending a

diversity recruiting event, the Recruiting Department responded: "we understand" and

"completely understand." (*Id.*).

> g. The allegation that she was the only African American female in the New York office.

Ms. Simmons emphasizes that she was the only African American female attorney in the

New York office. First, that "fact" is not "statistical evidence." Second,

> Statistics alone are insufficient in a disparate-treatment claim because an individual plaintiff must prove that he or she *in particular* has been discriminated against.

*Drake v. Delta Air Lines, Inc.*, No. 94-CV-5944(FB)(RML), 2005 WL 1743816, at *6 (E.D.N.Y.

July 21, 2005) (citing *Hudson v. Int'l Bus. Machs. Corp.*, 620 F.2d 351, 355 (2d Cir. 1980)

(emphasis in original).[7]

Accordingly, Ms. Simmons has failed to establish a prima facie case of discriminatory

discharge. *See Price*, 2010 WL 4910218, at *4 ("Because her bases for asserting discriminatory

intent are undermined, Plaintiff fails to demonstrate admissible evidence sufficient to permit an

---

[7]  *See also Martin v. Citibank, N.A.*, 762 F.2d 212, 218 (2d Cir. 1985) ("[S]tatistical proof alone cannot ordinarily establish a prima facie case of disparate treatment under Title VII . . . ."); *Hudson*, 620 F.2d at 355 ("[Plaintiff] has failed to establish his case and the statistics standing alone do not create it.); *Lee v. Poughkeepsie City Sch. Dist.*, No. 06-CV-4660 (KMK), 2008 WL 852790, at *9 (S.D.N.Y. Mar. 31, 2008) ("Plaintiff cannot establish that Defendant was motivated by discriminatory intent by appealing to statistics alone."); *Bussey v. Phillips*, 419 F. Supp. 2d 569, 583 (S.D.N.Y. 2006) ("Thus, absent other sufficient evidence, statistics that might be admissible as probative circumstantial evidence of discrimination are not enough to establish a genuine factual dispute.").

inference of discriminatory motive, and therefore Plaintiff fails to establish a prima facie case of race or gender discrimination . . . .") (internal citation and quotations omitted); *Simon v. Turner,* No. 94 CIV. 8446(JSR), 1997 WL 151486, at *4 (S.D.N.Y. Apr. 1, 1997) (Rakoff, J.) (granting summary judgment for employer because "[e]ach and every allegation looked at in context and in light of the 'totality of the circumstances' evinces nothing impermissible on the part of plaintiff's employers").

        2.      Akin Gump has a legitimate nondiscriminatory reason for
                    Ms. Simmons' termination: The Economy.

It is beyond dispute that the market for private equity funds was substantially hit in late 2008 and early 2009.  Mr. Vine and Mr. Mehta were forced to begin restructuring the IFPG.  A counsel was laid off from the Los Angeles IFPG in the fall of 2008.  (Statement at ¶ 41).  In early 2009, Mr. Mehta notified two associates in D.C. that they would need to leave the firm.  (*Id.* at ¶ 57).  In February 2009, Akin Gump began a formal firm-wide RIF process and Mr. Vine and Mr. Mehta selected three associates from the New York IFPG to be included in the RIF – Mr. Lore and Mr. Sirianni and Ms. Simmons.  (*Id.* at ¶ 58).  By this time the IFPG had identified Ms. Simmons as one of the weakest New York IFPG associates.  (*Id.* at ¶ 42).  Nevertheless, Mr. Vine removed Ms. Simmons from the RIF list, and Mr. Mehta deferred to Mr. Vine's decision.  (*Id.* at ¶ 58).  Accordingly, when Akin Gump laid off 47 attorneys firm-wide – including seven IFPG associates (five Caucasian males, one Caucasian woman, and one Asian woman), including Mr. Lore and Mr. Sirianni, Ms. Simmons was not laid off.  (*Id.* at ¶ 60).[8]

---

[8]  Akin and its IFPG were not alone.  "[T]he 250 largest U.S. law firms shed 5,259 attorney positions between Oct, 1, 2008 and Sept. 30, 2009 – the largest drop during the 30 years that the [National Law Journal] has been tracking law firms' headcount."  Karen Sloan, *Where Have All the Flowers Gone? The Financial Crisis Knocked Great Cracks in the Legal Industry's Foundations*, National Law Journal, Dec. 21, 2009.

In the spring of 2009, despite the substantial layoffs, conditions were not improving. (Statement at ¶ 61). In April 2009, IFPG incoming associates who had received offers after the summer of 2008, were deferred to start in March 2010. (*Id.* at ¶ 62). In June 2009, the firm had identified the IFPG, in particular, as "really lagging in terms of billables." (*Id.* at ¶ 64). In July 2009, Mr. Mehta, along with a partner from the Dallas IFPG, removed Mr. Curren (Caucasian), an associate in the Dallas IFPG, from the payroll. (*Id.* at ¶ 66). In September 2009, Mr. Vine and Mr. Mehta decided to terminate Ms. Simmons. (*Id.* at ¶ 71). At the end of 2009, the IFPG's revenue had decreased by 26% from 2008, and, despite the layoffs, the average billable hours per attorney was down 14% from 2008 and 19% from 2007. (*Id.* at ¶ 83).

3.   Ms. Simmons has no evidence of pretext.

Ms. Simmons has no evidence to demonstrate that Akin Gump's legitimate non-discriminatory reason - the economy - is merely a pretext for race discrimination. *Blake v. Bronx Lebanon Hosp. Ctr.,* No. 02 Civ. 3827(DAB), 2007 WL 2981465, at **9-11 (S.D.N.Y. Oct. 10, 2007) (granting summary judgment and holding no pretext, because, although plaintiff was the sole termination in one month, he was part of an overall RIF that occurred through the year); *Ruth v. Infonet Servs. Corp.,* No. 94 Civ. 5576 (JSM), 1997 WL 189038, at **9-11 (S.D.N.Y. Apr. 17, 1997) (granting summary judgment and holding no pretext when plaintiff's termination was delayed although others were fired, to give her time to improve her performance).

In addition, the New York IFPG did not recruit, make any offers, or hire any associates during 2010, even though two additional associates voluntarily left in 2010. (Statement at ¶ 78).[9] Two first-year associates whose 2008 offers had been deferred, started in March 2010 (although Mr. Mehta wanted to defer them longer). (*Id.* at ¶ 81). Two IFPG associates also transferred to

---

[9]   In 2009, Jason Stramel (Caucasian) was laid off, and then rehired in 2010 in the D.C. IFPG as a staff attorney. He was terminated by the end of the year. (Statement at ¶ 82).

21

New York from other offices: one is part of the group's India practice and the other had already

been working on New York matters.  (*Id.* at ¶ 80).  *See Alam v. HSBC Bank USA, N.A.,* No. 07

Civ. 3540(LTS)(JCF), 2009 WL 3096293, at **2-3 (S.D.N.Y. Sept. 28, 2009) (no evidence of

pretext even though five employees were hired post RIF).

### B.    Ms. Simmons' FMLA Leave Claim Must Be Dismissed (Count IX).

Ms. Simmons alleges that Akin Gump "interfered with, restrained, and denied plaintiff,

and retaliated against plaintiff for attempting to exercise her rights under the FMLA, in violation

of the FMLA, 29 U.S.C. §§ 21612(a), 2614(a)(1), and 2615(a)(1)."  (Amended Complaint at ¶ 74).

Ms. Simmons took FMLA leave, was paid for every day that she was out (including a full 2008

bonus), no one criticized her for taking such leave, and partners had work waiting for her upon her

return.  The only possible claim, therefore, is one of FMLA retaliation.[10]  (Statement at ¶¶ 34,56).

The Amended Complaint alleges that Akin Gump only "began to retaliate against [her]

after her dismissal," on December 31, 2009.  (Amended Complaint at ¶¶ 42, 43) (emphasis added).

The only "retaliatory conduct" alleged in the Amended Complaint is, therefore, Akin Gump's

alleged refusal to provide her with independent counsel after she was contacted "by various

governmental entities" as part of an investigation.  (*Id.* at ¶ 44).  The Court ruled on February 2,

2011, that these allegations do not support a retaliation claim.  Therefore, her FMLA retaliation

claim fails as well.  Even if the Amended Complaint is somehow read to allege that she was

terminated in retaliation for taking FMLA leave (which it does not say).  Ms. Simmons' FMLA

---

[10] At her deposition, Ms. Simmons asserted for the first time that her time out of the office visiting her brother in the hospital in Atlanta was protected FMLA leave.  However, the FMLA does not cover leave taken to care for a sibling.  29 U.S.C. § 2612(a)(1) ("[A]n eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: . . . . (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.").

retaliation claim still fails as a matter of law.[11]

       1.      Ms. Simmons can not establish a prima facie case.

The McDonnell Douglas burden-shifting framework also applies to Ms. Simmons' FMLA

retaliation claim. *See Thomas v. Euro RSCG Life*, 739 F. Supp. 2d 630, 633-34 (S.D.N.Y. 2010)

(granting summary judgment on employee's FMLA retaliation claim) (citing *Potenza v. City of

New York*, 365 F.3d 165, 168 (2d Cir. 2004)). To establish a prima facie case of FMLA

retaliation, Ms. Simmons must show that (1) she exercised rights protected under the FMLA, (2)

she was qualified for the position, (3) she suffered an adverse employment action, and (4) the

adverse employment action occurred under circumstances giving rise to an inference of

discriminatory intent. *Thomas*, 739 F. Supp. 2d at 633.

"Temporal proximity between a plaintiff's exercise of rights created by FMLA and adverse

employment action can give rise to an inference of retaliation." *Reilly v. Revlon, Inc.*, 620 F.

Supp. 2d 524, 538 (S.D.N.Y. 2009) (granting summary judgment because employee had failed to

make out a prima facie cases where two and a half months elapsed between expiration of

employee's leave and her termination). However, "the time period between the protected activity

and the allegedly retaliatory conduct must generally be less than two months." *McFarlane v.

Chao*, 04 Civ. 4871 (GBD)(HBP), 2007 U.S. Dist. LEXIS 99188, at *67 (S.D.N.Y. Mar. 13,

2007); *see also Meggison v. Paychex, Inc.*, 679 F. Supp. 2d 379, 388 (W.D.N.Y. 2010) (granting

summary judgment for employer where employee failed to establish an inference of

discriminatory intent where three months and 24 days elapsed between employee's return from

---

[11] It is unsettled in this jurisdiction whether a mixed-motive analysis applies to FMLA retaliation claims. *See Sista v. CDC IXIS N. Am., Inc.*, 445 F.3d 161, 176-77 (2d Cir. 2006). If the Court chooses to apply a but-for standard, Ms. Simmons' claims fail because she cannot refute the undisputed evidence that she was terminated because of the economy and that she was one of the weakest performers in the New York IFPG.

FMLA leave and his termination).  In this case, the elapsed time between Ms. Simmons' return

from her FMLA leave on September 8, 2008, and the notification of her termination more than a

year later on September 17, 2009, is "insufficiently temporally proximate" to create an inference

that her termination was a result of her FMLA leave.

> 2.      There is a legitimate nondiscriminatory reason for Ms. Simmons'
>         termination and Ms. Simmons has no evidence of pretext.

As discussed above, Ms. Simmons (and dozens of other attorneys) was laid off in 2009

because of the economy.  It is not evidence of pretext that, at her January 2009 performance

review meeting, Ms. Simmons was told that her time out of the office (in 2008, she had a two

week honeymoon, six weeks of FMLA leave, and a week and a half with her brother) had

impacted her learning curve, or that Ms. Tadajweski was looking forward to working with her on

an uninterrupted basis in the upcoming year.  (Statement at ¶¶ 34,34,43-46,49,51).  First, there is

no evidence that FMLA leave was even mentioned.  Second, Mr. Vine and Mr. Mehta could have

terminated Ms. Simmons as part of the March 2009 RIF if they were intent on punishing her for

taking FMLA leave.  It simply makes no sense that they instead removed her name from the RIF

list, and Mr. Vine and others made a concerted effort to get her more work and more fully

integrated into the group.[12]

---

[12]  *See LeBeoeuf v. N.Y.  Univ. Med. Ctr.*, No. 98 CIV. 0973(JSM), 2000 WL 1863762, at *4
(S.D.N.Y. Dec. 20, 2000) ("Thus, even if one accepts the inference that Sherman was angry
because Plaintiff took his leave at a critical time, the fact that he was reinstated despite her
alleged displeasure gives rise to an inference that her anger at Plaintiff was not the reason for his
termination."); *McFarlane*, 2007 U.S. Dist. LEXIS 99188, at **72-76 (granting summary
judgment for employer where employee did not rebut employer's evidence the budgetary
constraints were a factor in not renewing her appointment).

## IV.     CONCLUSION

For these reasons, Defendant Akin Gump requests that the Court grant summary judgment on Counts I, III, V, VII, and IX of the Amended Complaint.

DATED:  April 1, 2011                    Respectfully submitted,

                                         _____/s/ Christine Nicolaides Kearns_____
                                         Christine Nicolaides Kearns (admitted pro hac vice)
                                         Rebecca Carr Rizzo (admitted pro hac vice)
                                         PILLSBURY WINTHROP SHAW PITTMAN LLP
                                         2300 N St., N.W.
                                         Washington, D.C. 20037
                                         Telephone: (202) 663-8000
                                         Facsimile:  (202) 663-8007
                                         E-mail:  christine.kearns@pillsburylaw.com
                                                  rebecca.carr@pillsburylaw.com

                                         Andrew C. Smith
                                         PILLSBURY WINTHROP SHAW PITTMAN LLP
                                         1540 Broadway
                                         New York, New York 10036-5406
                                         Telephone:  (212) 858-1000
                                         Facsimile:  (212) 858-1500
                                         E-mail:  andrew.smith@pillsburylaw.com
                                         COUNSEL FOR AKIN GUMP
                                         STRAUSS HAUER & FELD LLP

402804029v3