```
1594simc
```

```
  1   UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
  2   ------------------------------x
  3   TAMEKA SIMMONS,
                   Plaintiff,
  4
                 v.                              10CV8990(JSR)
  5
      AKIN GUMP,
  6              Defendant.
  7   ------------------------------x
                                              New York, N.Y.
  8                                           May 9, 2011
                                              5:10 p.m.
  9
      Before:
 10
                          HON. JED S. RAKOFF
 11
                                       District Judge
 12
                              APPEARANCES
 13
      VLADECK WALDMAN ELIAS & ENGELHARD
 14        Attorneys for Plaintiff
      DEBRA L. RASKIN
 15   LIANE TAI RICE

 16   PILLSBURY WINTHROP
           Attorneys for Defendant
 17   CHRISTINE KEARNS
      KEITH HUDOLIN
 18
 19
 20
 21
 22
 23
 24
 25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

1         (Case called)
2         THE COURT:  So, for reasons that were neither the
3    fault of the court nor of counsel, I gave counsel the choice
4    earlier today to either argue for no more than a half hour now
5    or alternatively to come back for more extensive oral argument
6    or submit papers.  They chose to argue briefly now.
7         So, I advise counsel to limit themselves to things
8    that are not in their papers.  The papers here were excellent,
9    really.  Frankly, I think this is the kind of motion where the
10   practice of my former chief judge Mike Mukasey which was almost
11   never to hear oral argument might have been appropriate, but my
12   policy is to hear oral argument, but I only want to hear
13   anything that's new that's not in your papers.
14        Let me start with moving counsel.
15        MS. KEARNS:  Thank you, your Honor.  I will restrict
16   myself to what's not in the papers.  As you noted when we were
17   at the bench earlier, the submissions are large, so you might
18   think there is nothing that's not in there.
19        THE COURT:  That thought certainly crossed my mind.
20        MS. KEARNS:  I have a quite lengthy list of things
21   that one will not find when they look through the plaintiff's
22   submission.  Let me start with the fact there is no dispute
23   here of course that Mr. Vine and Mr. Mehta enthusiastically
24   made the decision hire the plaintiff in June 2007 and were the
25   decision-makers in September 2009.

1          But in the large submission from the plaintiff, you do
2  not see one scintilla of evidence of discriminatory animus on
3  the part of Mr. Mehta at all, nothing, nor is there any
4  evidence in that submission that he even knew about her medical
5  leave.  The case is about his discriminatory animus and his
6  unhappy feelings I guess about her taking medical leave and
7  deciding to terminate her for those reasons.  Nothing on either
8  of those points on Mr. Mehta.
9          On Mr. Vine, same; there is nothing in her submission
10 that suggests any discriminatory animus by Mr. Vine.  Quite the
11 opposite.  He told people to work with her and he worked with
12 her himself.  He took her off RIF list.  All of that is in
13 there.  What's not in there is any evidence of his
14 discriminatory animus.  He did know about her medical leave,
15 but there is no evidence that he had any problem with it
16 whatsoever.  The only thing they can point to is he said her
17 being out the office, honeymoon, accident with her brother and
18 medical leave could have affected her learning curve, and he
19 turned around and told people to work with her.  There is not a
20 single connotation about her medical leave from Mr. Vine.
21         Those are the only two people at Akin Gump that the
22 court should be focusing on with respect to this case.  The
23 other thing you are not going to find in that huge stack is an
24 expert report.  They placed enormous weight or tried to on what
25 they call statistics, I will call them numbers, about who was

4

1  in the layoff, who worked in the office, who didn't work in the
2  office, things like this.
3        There was an opportunity to get an expert to show any
4  statistical significance with respect to who worked there, who
5  was hired there, who was let go.  No expert was ever
6  identified.  Those are just numbers with no context, no basis
7  whatsoever.  If they were serious that the numbers had meaning,
8  we would have an expert.  Without an expert for the labor pool
9  and other statistical significant indicia, the numbers mean
10 nothing, and there is no expert report.
11       What else isn't there; there is no explanation because
12 there is no explanation for why.  If they wanted to fire Tameka
13 Simmons because she took medical leave in the summer 2008, why
14 didn't they include her in the RIF in March 2009.  If that's
15 really the theory that they fired her, why didn't they fire her
16 the first chance they got.  They fired six people that day from
17 their practice group.
18       Same for the race allegation, your Honor.  If they
19 really wanted to fire her because of her race, why didn't they
20 include her.  They fired six white associates that day and one
21 Asian, but not her.  So what's the explanation.  There is no
22 explanation in their stack for that because there is no
23 explanation at all.
24       In discovery in this case, as is often the case
25 unfortunately in allegations about law firms, they got

1   discovery and actually got copies of the performance
2   evaluations of all the eight lateral associates hired into the
3   New York investment funds group in 2007.  You saw in our papers
4   they had like a hiring binge in 2007 because things were really
5   hot and Ms. Simmons was hired with seven other people that
6   year.  They got all their evaluations for 2008.
7              In that stack do you see those eight people's
8   evaluations.  No.  They attached I think Exhibit 22 to
9   Ms. Raskin's affirmation.  You have one evaluation of someone
10  they say did much worse than she did.  That's arguable but let
11  her argue that.  That person was fired in the RIF in March
12  2009.  He was let go over six months before her.  The only
13  person they can say had a worse evaluation, which I actually
14  dispute, but let her have it.  She had 6 needs-development; he
15  had 7.  She had them in more categories; he had more in number.
16  Fine.  But the point is he got fired six months before she did.
17             In their huge stock, do they point to anybody who has
18  a worse performance evaluation than she did who didn't get
19  fired.  You know, her performance evaluation wasn't terrible.
20  We have never said it was terrible.  We never said we fired her
21  because she could not perform.  She was the weakest of the ones
22  left after the first round of the RIF.  They don't point to
23  anyone who is doing any worse than she was.  That's sort of a
24  suggestive view anyway.
25             In fact, the testimony is clear that they said if

1   there hadn't been this incredibly devastating downturn
2   nationally which affected the firm, 47 people got fired on one
3   day in March, 12 people in her own practice group during the
4   course of 2009, she might not have gotten fired.  She was not
5   great but she wasn't a disaster.  It's just that she wasn't as
6   strong as they had hoped she would be.
7              But what's missing is anybody who was worse.  I
8   suggest you go to Exhibit 22.  They have attached the
9   performance evaluation of one other lateral associate, who I
10  submit I think has one needs-development; that's around Exhibit
11  23 or 24.  They attached the performance evaluation for 2008 of
12  a first-year who had proof-reading errors.  But none of the
13  other 2007 laterals in that huge pile, none of the performance
14  reviews, and they got them all in discovery.
15             When I deposed Ms. Simmons, this is in our submission,
16  I asked her, you say work was taken away from you, what work
17  was taken away, you will see it in our submission, she names
18  two matters where she claims work was taken away.  One she had
19  to admit was given to a more senior associate and the
20  explanation was they wanted a senior associate, and one was to
21  a guy who had been on vacation and came back and he got his
22  work back.  That's what she told us in her deposition.
23             In the submission, they have got all these different
24  matters supposedly taken away from her, creating a suggestion
25  of a factual dispute here.  There is none, because when you

1   look at, just go right to Tameka Simmons Exhibit 1, she
2   submitted 79 pages of her own billing records, I don't know
3   why, and you will see billing records.  She comes back from
4   medical leave and between September and November she gets ten
5   new assignments from Ann Tadajweski, ten.
6           Your Honor, I actually brought the billing records,
7   the 79; they are by matter number.  I want through and
8   highlighted.  You can see the ten new assignments in two months
9   after she came back from medical leave.  She herself said at
10  paragraph 246 of her affidavit, she says that her hours in 2008
11  were on par with her colleagues.  They were.  They were.  So
12  where was the work being taken away from her if her hours were
13  on par.  That's not claimed in her submission.  Her submission
14  says they were on par.  They were.
15          No one ever said she was fired because she had low
16  hours.  No one ever said she had low hours.  Her hours were on
17  par but she now says work was being taken away from her.  Also
18  in her own submission, according to her, work was being taken
19  way from her she argues, but the argument is one thing, it's
20  the facts, right.  She says under oath that Arina Lekhel and
21  Ira Kustin gave her, offered her long-term assignments in 2009.
22  Why would they do that if work was being taken away from her.
23  That's what she says,
24          It's undisputed that Steve Vine following her January
25  performance rating, that Steve Vine told partners in the

1   practice group to work with her if they had available work.
2   She can't dispute it; she wasn't there for the conversation.
3   He says it, I think Tadajweski says it, Lekhel says it.
4   Everybody agrees he did that.  He says after the RIF he didn't
5   do anything in particular to help her out.  There is no
6   evidence he helped anyone out in particular after the RIF.
7              What we do know is he himself, cochairman of the
8   practice group, head of the New York office practice group,
9   worked with her himself in 2009.  Undisputed.  It's also
10  undisputed that she made a mistake and Arina Lekhel helped her
11  out and it was corrected.  But why is, how is work being taken
12  away from her when the head of the practice group himself is
13  telling people to work with her, undisputed, and working with
14  her himself.  There is no explanation for that in here.
15             All she offers are charts prepared by Ms. Raskin's
16  legal assistant, I am not going to go over them now, that as we
17  explain in our reply actually don't mean anything.  She can't
18  get away from the undisputed evidence that people were offering
19  her work, working with her, and her hours were on par with
20  others.
21             Let's talk for a second about Christopher
22  Gorman-Evans, the partner who Ms. Simmons describes as
23  notoriously difficult.  As we point out, his being notoriously
24  difficult is much ado about nothing because he has no role in
25  hiring her or deciding to fire her.  He didn't review her.  She

1   didn't ask that he review her.  She picked her own reviewers.
2   Let's talk about this allegation.  What's not in there.  Where
3   is the white associate that he treated differently.
4          Sheila Azad was assigned to work with him.  Look at
5   Exhibit 55 to Ms. Raskin's declaration, Sheila Azad's billing
6   records.  She spent 900 hours working on Christopher
7   Gorman-Evans' project.  900.  She is white.  Where is the
8   racial discrimination in assigning Ms. Simmons to work for
9   Christopher Gorman-Evans.  There is no one treated differently
10  in there.  What's in there is 900 hours for Sheila Azad; white,
11  lateral associate, joined the firm in 2007, just like Ms.
12  Simmons.
13         I have a few more.  I don't really like to rely on
14  technicalities and pleadings.  At this stage we should be past
15  that.  We were here on a motion to dismiss on the pleadings,
16  the problems with the pleadings, but how it that the
17  complaint --
18         THE COURT:  I assume you both got, I finally got out
19  my written opinion on that motion; it was faxed to both sides
20  earlier today.
21         MS. KEARNS:  I did not get that.
22         THE COURT:  Something for your bedtime reading.
23         MS. KEARNS:  Thank you, your Honor.  I want to say
24  something about the pleadings.  We have an amended complaint
25  here; it's 70-something paragraphs long.  It expressly states

1594simc

1    that the retaliation against Ms. Simmons began, retaliation
2    began after her termination, December 2009.  That's what it
3    says.  So I just don't get it, there is nothing in here, why
4    they get to argue now without amending their complaint that
5    FMLA retaliation began before.
6              I direct you to paragraph 43.  That's what they say;
7    it began.  Discrimination continued, the retaliation began.  So
8    there is no explanation that I can see, a legal explanation why
9    someone gets to essentially amend their amended complaint at
10   the time of summary judgment.  That would be paragraph 43.
11             There is an argument that Ms. Simmons has made that it
12   was really unfair to terminate her or let her know she had to
13   leave by the end of the year.  They told her in September.  She
14   said it was really unfair that they did that waiting to see her
15   next round of review and it's unfair.  Unfair is not
16   discrimination.  Because it's undisputed that Mr. Elfenbein
17   from the practice group was terminated in October 2008.  There
18   is no evidence that anyone waited to get his performance
19   review.  It's undisputed that he was terminated for economic
20   reasons just like Ms. Simmons.  No one waited for his
21   performance review.
22             There is more.  In July of 2009, just two months
23   before Ms. Simmons, they told Tim Curran, you're off the
24   payroll, another guy in the practice group, another associate,
25   you're out of here.  They didn't wait for his review.  So it

1594simc

1   may feel unfair to her that they didn't wait to see her
2   performance review, but where is the discrimination.  The only
3   two comparators, and no one waited for their performance
4   reviews.  You don't see that in the stack.
5           THE COURT:  I need regretfully to keep both sides
6   strictly to the 15-minute limit.  You have reached yours.  With
7   apologies, let me turn to plaintiff's counsel.
8           MS. RASKIN:  Thank you, your Honor.  Let me just deal
9   with the most recent first then I will work back.  With respect
10  to these two individuals, Elfenbein was terminated in October
11  2008.  He was hired a couple months before that to work on AIG.
12  AIG crashed.  He was let go.  Tim Curran never worked on client
13  matters.  He had been working on computer-related billing.
14          The reason it's significant that no one bothered to
15  look at Ms. Simmons' evaluations as of September 2009 when the
16  decision was being made to let her go was that the purported
17  reason in March 2009 for saving her from the layoff list was,
18  number 1, supposedly race and we can question the benign intent
19  there, but number 2, to see if business picked up and also to
20  see if her work improved.  That was their articulated reason.
21          Mr. Vine testified, although counsel said he worked
22  with her in 09, that he had no knowledge of her performance
23  during 09.  That's pretext, your Honor, or at least the jury
24  can consider that as one element of pretext, that we are
25  trotting out these individuals like Elfenbein and Tim Curran

1   who are completely dissimilar and throwing them in because they
2   are white associates.  So we have a situation here where
3   Mr. Vine has said he knows nothing about her performance during
4   the year even though as of March, he was keeping her on to see
5   if that performance would improve.
6              Let me go to the issue of their solicitude because of
7   her race which I see that counsel has left out.  I would point
8   out to the court that just Justice Kennedy's comment in the
9   *Parents Involved v. Seattle School District* case where he says,
10  quote, there is simply no way of determining what
11  classifications are benign or remedial or what classifications
12  are in fact motivated by illegitimate notions of racial
13  inferiority or simple racial politics.
14             That's what we see with Mr. Gorman-Evans where he
15  calls Ms. Simmons lazy and stupid, and on the contrary we have
16  very dramatic evidence of differential treatment of a white
17  associate, Ms. Azad, who told Ms. Simmons that Mr. Gorman-Evans
18  was always nice to her.  So again you have evidence of
19  differential treatment that the jury can use as one of many
20  strands, and the Second Circuit has cautioned that this is to
21  be taken in the totality, not one piece at a time.
22             Mr. Mehta did not make the decision in September 2009
23  to let Ms. Simmons go.  He stated that he simply went along
24  with what Mr. Vine had to say because Mr. Vine was in the New
25  York office.  And mr. Vine, contrary to what counsel has said,

1   had himself made some biased remarks concerning Ms. Simmons'
2   FMLA leave.
3           Let's get the context, the timing of this correct,
4   because that's very important.  You have at the end of 2007, a
5   favorable oral review of Ms. Simmons.  That's not disputed.
6   You have in mid 2008 a favorable oral review of her.  That's
7   not disputed either.  The attorneys who gave that review,
8   partners Lekhel and Tadajweski, who gave that review place it
9   in July 08.  In late July 08, Ms. Simmons goes out on FMLA
10  leave and doesn't come back until the first week in September.
11          Two weeks later is when these written reviews of 2008
12  are being written.  So she's been in the office a total of a
13  couple of weeks between the favorable oral 08 review and the
14  written review in 08 which is again not a terrible review, much
15  of it is very good, but it's what counsel is seizing on as the
16  reason for firing her.
17          Then we get to the January 09 review given by Mr. Vine
18  and Ms. Tadajweski.  In that oral review, Mr. Vine says that
19  Ms. Simmons had been, quote, gone a lot the prior year and that
20  was the reason that she wasn't connecting with enough clients.
21  Ms. Simmons pointed out that she had connected with four
22  clients, had four client matters, which was the number that he
23  had given, but he gave that as a reason.  She then said are you
24  talking about my FMLA leave.  He does not deny it; he just says
25  again, you were out a lot.

1          There are other comments like that that the jury could
2  infer reflecting, and judge, let me clear up this pleading
3  issue.  What we say in our complaint in the first paragraph is
4  that Ms. Simmons was discriminated against for taking the FMLA
5  leave.  It's plain throughout the complaint that we are talking
6  about discrimination while she was there, discrimination in the
7  firing.  The *Euro RSCG Life* case pointed out that punishing
8  somebody when they come back from leave under the FMLA is
9  treated as discrimination.  That's really a red herring that
10 the court does not have to deal with.
11         To go back to the FMLA leave, we have not only
12 Mr. Vine's comments during that oral review, we have Tadajweski
13 telling Simmons she needed to be in the office more.  We have
14 Lekhel telling her she was difficult to work with because she
15 was out of the office so much.  A reasonable jury could take
16 those comments as meaning that the FMLA leave played a part in
17 the decision to fire her.
18         Let me deal with the issue of work taken away from
19 Ms. Simmons.  Counsel has made much of giving her ten new
20 matters in 2008, but we have to look a little more closely at
21 the numbers.  Of those ten new matters, only four remained
22 exclusively with Ms. Simmons.  Each of those matters took less
23 than a month.  There were a total of some 26 billable hours
24 from those four matters.  That levers six matters that were
25 given to her in 2008 on this particular client.  Four of the

1    six were given to Ms. Azad.  In other words, Simmons worked on
2    it for a little bit; pretty soon they were shuffled over to Ms.
3    Azad.
4              Then we get to 2009.  In 2009, this is undisputed,
5    Ms. Simmons received no new matters on that client, even though
6    counsel, even though the partners testified that it's the
7    practice to give the associate more matters on the client they
8    worked on before, was given no now matters on that client, and
9    ten were given to Azad in 2009.  So that whatever may be said
10   about Mr. Vine's efforts to find work for Ms. Simmons in 2009,
11   and that is disputed because Mr. Vine didn't even remember
12   doing so when he was asked about whether he had done anything
13   to facilitate her getting work in that period.
14             Again that becomes striking because what's the
15   articulated reason in March 2009.  The reason is we want to get
16   her more work, we want to see what her performance is.  But
17   nothing is done.  Work is taken away from her.  Vine and Mehta
18   both admit that they have no idea what her performance is like
19   on 2009.
20             The issue of the numbers, your Honor, what the cases
21   have said is that numbers in and of themselves cannot make a
22   showing of pretext.  But again, we have a situation here where
23   the numbers become a part of the total picture.  You have a
24   situation where in 2009, two African-American associates in
25   this group are fired, half of the group; it's only a quarter of

1   the white associates in the group.  You have a situation where
2   in 2006, 8 percent --
3           THE COURT:  I am really hesitant, I purposely did not
4   ask questions before even though I have lots of questions for
5   both of you, because we are under such a short time limit, but
6   just on that one point, how is that statistically significant
7   unless you know the percentage of white employees as a whole
8   versus black employees as a whole.
9           MS. RASKIN:  You do; you have those numbers for the
10  group.
11          THE COURT:  What are those numbers?
12          MS. RASKIN:  You have four African-American associates
13  of whom two are fired.  I think you have I think 26, 28 white
14  associates of whom a quarter are fired.  You have situation
15  here, this is not the only number, you have a situation where
16  in 2006, the New York office of Akin, which has 200 lawyers,
17  was about 8 percent African-American associates.
18          THE COURT:  So, if they had fired one less
19  African-American, your statistics would be meaningless, yes?
20          MS. RASKIN:  Your Honor, what I am saying is you have
21  to so it in the context of the whole picture.
22          THE COURT:  I must say I am finding it difficult.  I
23  totally agree with you, of course, the case law is clear, one
24  has to look at the entirety of all the evidence.  But that
25  doesn't mean that meaningless statistics are anything less than

1   meanings or anything more than meaningless.

2          MS. RASKIN:  Let me give you two other numbers that
3   are significant.  One is in 2006, 8 percent, 8.3 percent of the
4   New York office's associates were African-American.  In 2010,
5   it was down to 1 percent; that is, one male African-American
6   associate.  If you look at, this has been submitted, the chart
7   of other law firms in New York City, other major law firms.  In
8   a chart of some 68, 69 law firms, Akin Gump is number 62 in
9   terms of the number of African-American associates and the
10  percentages.

11          So while of none of these numbers is dispositive, the
12  jury can take them together with the other evidence, with the
13  criteria for the review, which is subjective, mushy, and the
14  change in Ms. Simmons' performance from the positive reviews in
15  07 and mid 08, until we get to the January 09 oral review,
16  those kinds of changes in performance or in the evaluation of
17  the performance, the Second Circuit has repeatedly said could
18  be one piece of evidence of pretext.  There are, your Honor, in
19  our papers the evaluations of other associates.

20          Let me go to the economic downturn issue and the
21  significance of that in September 2009 when the firing decision
22  is made, because there is significant evidence from which a
23  jury can infer, not that Lehman didn't crash and that that
24  didn't happen, but by September 09 things were picking up.

25          Ms. Kearns pointed to work given to Ms. Simmons or

1    offered to Ms. Simmons by Ms. Lekhel and Mr. Kustin in 2009.
2    When were those pieces of work offered; in September after she
3    was fired.  What Ms. Lekhel said was that things were very busy
4    at that time, and when Mr. Kustin offered Ms. Simmons work
5    after she was fired, he said he wasn't going to give it to the
6    white associate, Mr. Fleenor, because he was too busy.  And on
7    top of that, we have the evidence from Mr. Mehta who comes to
8    the New York office in September 09 and says, New York is where
9    the business is, we are going to get through this.
10             THE COURT:  What about the argument of your adversary
11   that if discrimination was the reason for the firing, they
12   would have done it earlier, where none of these arguments you
13   are now making would have applied.
14             MS. RASKIN:  I will tell you one reason at least, your
15   Honor, which is that the U.S. managing partner,
16   Ms. Coopersmith, told Mr. Mehta, this is his testimony, that
17   when they had the three individuals, the three associates as
18   possible layoff candidates, Ms. Simmons and the two white
19   associates in March, Mr. Mehta's testimony is she said that the
20   list is too deep at three and maybe even at two.
21             So if you have a record here, where the U.S. managing
22   partner is saying you are laying off too many people and you go
23   ahead and lay off an African-American whose performance to that
24   point certainly in the oral reviews had been quite good, quite
25   comparable, these are clever men who may discriminate in clever

1594simc

1  ways.  That's the Second Circuit in *Ramsour*.  So they have the
2  managing partner telling them --
3              THE COURT:  You think they're clever men; I thought
4  they were lawyers.
5              MS. RASKIN:  I am not touching that one, your Honor.
6  So that they were making their own pretext as of March 2009.
7  In 2008, it's correct that her hours were on par.  What's
8  interesting is there were at least three white lawyers,
9  associates and one counsel, whose hours were plainly
10 insufficient, and they were not addressed, they were not
11 touched in the March 09 layoff.
12             THE COURT:  Your time has elapsed.  I did interrupt,
13 so if you have one other point you are dying to make, make it
14 now; otherwise, I need to bring this to a close.
15             MS. RASKIN:  The only other point is the Second
16 Circuit's statement in *Kaytor v. Electric Boat*, which is that
17 in an analyzing pretext, the court should not parse individual
18 pieces of evidence and try to give them the most innocent
19 meaning possible but consider the totality of the evidence in
20 the way the jury should do.
21             THE COURT:  I thank both counsel for this very helpful
22 argument.  The court will take the matter *sub judice*.
23                            - - -
24
25