UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TAMEKA SIMMONS                               :

            Plaintiff,                       :

      -v-                                     :

AKIN GUMP STRAUSS HAUER & FIELD, LLP,        :

            Defendant.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/6/11
```

10 Civ. 8990 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

        Plaintiff Tameka Simmons brings this employment
discrimination action against her former employer, defendant Akin
Gump Strauss Hauer & Field, LLP ("Akin"), asserting various claims
arising from her termination.  On February 1, 2011, the Court granted
Akin's motion for partial judgment on the pleadings and dismissed
Counts 2, 4, 6, and 8 of her Amended Complaint, a decision the Court
explained in a Memorandum Order dated May 9, 2011.  Akin subsequently
moved for summary judgment dismissing Simmons' remaining claims,
which allege that Akin Gump discriminated against her on the basis of
her race (Counts 1, 3, 5, and 7) and retaliated against her because
of her exercise of her rights under the Family and Medical Leave Act,
29 U.S.C. § 2601 et seq. ("FMLA") (Count 9). The Court, by Order
dated May 30, 2011, granted the motion and dismissed the remaining
counts.  This Memorandum Order sets forth the reasons for that ruling
and directs the entry of final judgment.

1

The pertinent facts, either undisputed or, where disputed, taken most favorably to Simmons, are as follows. Simmons is an African American woman who, in May 2005, graduated near the top of her class at Howard Law School. Defendant's Rule 56.1 Statement of Undisputed Material Facts ("Def. 56.1") ¶ 1; Plaintiff's Opposition to Defendant's Statement of Undisputed Facts and Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1") ¶ 1.[1] In September 2005, Simmons began working at the law firm of Debevoise & Plimpton, LLP ("Debevoise") in New York, focusing on mergers and acquisitions. Def. 56.1 ¶ 1. After working for nearly two years at Debevoise, Simmons was contacted by two African-American female associates at Akin seeking to recruit her to work at Akin. Id. ¶¶ 5-6. In May and June, 2007, Simmons interviewed with seven partners in Akin's Investment Funds Practice Group ("IFPG") in New York, which was looking to hire several lateral associates from other law firms. Id. ¶¶ 3, 7. Simmons received uniformly positive reports from her interviewers, and Akin soon made her an offer of employment. Pl. 56.1 ¶ 8. At least one partner, Stephen Vine, co-chair of IFPG, indicated that her hire would be "good for diversity." Id. ¶ 106. After receiving assurances from Prakash Mehta, the other IFPG co-chair, that she would receive the training, resources, and mentoring

---

[1] Unless otherwise indicated, all citations hereafter to one party's 56.1 statement incorporate the corresponding paragraphs of the opposing party's statement.

necessary to succeed in a new practice area, and that she would be able to transfer to the Washington DC office at some point in the future, Simmons accepted Akin's offer.  Id. ¶ 101-09.  Simmons was one of eight lateral associates hired by Akin to work in IFPG between April and October, 2010, several of whom -- like Simmons -- had no previous experience working with investment funds.  Def. 56.1 ¶ 3; Pl. 56.1 ¶ 4.

Upon her arrival at Akin, Simmons was initially assigned to two clients, but spent the bulk of her time working on matters for "Client A" with Christopher Gorman-Evans, an Akin partner based in the firm's London office.  Def. 56.1 ¶ 10.  Another new lateral associate, Shelia Sharifi-Azad, who is not African-American, was also assigned to work on Client A matters for Gorman-Evans.  Id.  Mehta testified that "although Christopher is difficult to work with, he's one of the [firm's] best teachers" and is one of the "finest and most intelligent" lawyers at the firm.  Id. ¶ 12.  Vine testified that he viewed the Client A assignment as "plum" because Client A is "one of the most highly regarded private equity firms in the world."  Id. ¶ 13.  However, Vine and Mehta were both aware that several associates, of various races, had complained about their interactions with Gorman-Evans.  Pl. 56.1 ¶ 12.

Gorman-Evans soon encountered problems with Simmons' work performance, and, in contemporaneous e-mails to other IFPG attorneys,

described her as "careless and unfocused," and once stated that a particular mistake she made was "pathetic." Id. ¶ 15. But see Pl. 56.1 ¶ 15 (noting that Gorman-Evans testified that Simmons' work was "otherwise good," and that she was pleasant to work with). In one incident of particular note, Gorman-Evans became very angry when he discovered that both Simmons and Sharifi-Azad would be out of the office on a particular day. Pl. 56.1 ¶ 22 (stating that Gormon-Evans later called Simmons "stupid" and "irresponsible" because of the incident but did not direct similar abuse at Sharifi-Azad). In December 2007, Simmons complained to several partners about Gorman-Evans' behavior, and she was soon thereafter assigned to a new project with another partner. Def. 56.1 ¶ 27. She did not, however, ever complain that Gorman-Evans' behavior was motivated by race. Deposition of Tameka Simmons, dated February 23, 2011 ("Simmons Dep.") at 139:11-14.

In August 2007, Simmons began working on "Client C" matters under the supervision of Arina Lekhel. Def. 56.1 ¶ 16. Lekhel found Simmons' work inadequate in several respects, testifying that Simmons lacked strong analytical and drafting skills. Id. ¶ 23. Beginning in late 2007 and continuing for several months, Simmons also worked intermittently on tasks for "Client B" with Michelle Hsu, a lawyer in the D.C. office. Def. 56.1 ¶ 28. Hsu was also unsatisfied with Simmons' work performance, primarily because of Simmons'

4

unresponsiveness.  Id.  Sometime in 2008, Vine approached Simmons about working on a new project, but Simmons declined to work on the project because she did not want to work with the lawyer assigned to it, Rachel Glasgow.  Id.

Soon after starting work at the firm, Akin assigned Ann Tadajweski, an IFPG partner, to serve as Simmons' partner mentor. Def. 56.1 ¶ 17.  Tadajweski did very little mentoring of Simmons, testifying that she "introduc[ed] her to people in the office and nothing much beyond that."  Pl. 56.1 ¶ 17.  By contrast, Tadajweski was an engaged mentor to Sharifi-Azad.  Id.  In January 2008, Akin assigned Mark Barth to be Simmons' new partner mentor, but Simmons was not made aware of the change, and Barth did nothing to mentor her.  Id.  In October 2007, Simmons expressed concern to Mehta about the perceived lack of training opportunities at Akin, but Mehta did nothing to follow up on this conversation.  Id. ¶¶ 134-35.  However, during Simmons' employment at Akin she attended at least 22 formal training programs sponsored by the firm.  Def. 56.1 ¶ 22.

In November 2007, Tadajweski and Vine agreed to conduct abbreviated oral performance reviews for the new lateral associates who had been hired earlier that year, a group that included Simmons. Id. ¶ 24.  Tadajweski did not recall giving Simmons any negative feedback at her oral review, and Vine reported that his review was "favorable."  Pl. 56.1 ¶¶ 29, 170.  In 2008, Simmons, along with all

the other recently-hired lateral associates, received a mid-year
review.  This review was, again, generally positive.  See Pl. 56.1 ¶
32.

From June 11 through June 25, 2008, Simmons was out of the
office for her wedding and honeymoon.  She was also out of the office
on vacation on July 18, 2008.  Def. 56.1 ¶ 33.  Subsequently, from
July 24, 2008 through September 5, 2008, Simmons took leave pursuant
to the FMLA for a "major surgery".  Id. ¶ 34; Pl. 56.1 ¶¶ 180-82.
Akin gave Simmons all the FMLA leave she requested, paid her every
day that she was out of the office, and adjusted her billable hour
requirements for purposes of calculating her bonus. See Simmons Dep.
at 118:9-119:1.  No one at Akin ever communicated to her during her
FMLA leave that they were unhappy about her being on leave.  Id.
Shortly after her return from FMLA leave, Simmons, on September 25,
2008, made a request to schedule six remaining vacation days for
2008.  Def. 56.1 ¶ 40.  Tadajweski approached Simmons on September
30, 2008 and conveyed her belief that Simmons had not been in the
office sufficiently to "become integrated in the practice and to
learn more about our . . . practice."  Pl. 56.1 ¶¶ 192-93.  Simmons
thereafter pared back her request for vacation days (but later ended
up having to use all her remaining vacation days when her brother had
a serious accident, see infra).  Id. ¶ 194.  The next day, on October
1, 2008, Simmons submitted a request for a three-week vacation to

South Africa from June 29, 2009 through July 20, 2009.  Id. ¶ 194.

In response, Tadajweski wrote, by e-mail, to two other Akin partners

that "This is kind of an amazing request after I had a conversation

with her yesterday about needing to be in the office and available to

get work experience."  Id.  The request was approved.  See id.

On December 9, 2008, Simmons' e-mailed Tadajweski informing

her that Simmons' brother had had a major accident and that she "did

not feel comfortable" leaving the hospital.  Def. 56.1 ¶ 41.

Tadajweski responded, by e-mail, "Of course, stay as long as you need

to."  Id.  Simmons returned to the office on December 13, 2008.  Id.

¶ 42.  No one at Akin ever suggested to Simmons that her actions with

regard to her brother's accident had been in any way improper.  Id.

Separately, from June 26, 2009 through July 20, 2009, Simmons went on

the vacation to South Africa of which she had given notice the

previous October.  Id. ¶ 64.  From September 11 to September 13,

2009, Simmons went on vacation to Jamaica.  Id. ¶ 70.

According to Akin's personnel records, separate and apart

from the twenty-nine days of FMLA leave Simmons took in 2008, Simmons

took more days of leave classified as "vacation" from 2007 to 2009 --

forty-nine days, totaling 356.8 hours -- than any of the other

nineteen IFPG associates.  See Affirmation of Debra L. Raskin, dated

April 25, 2010 ("Raskin Aff.") Ex. 16 (also indicating that thirteen

of the twenty associates listed took ten or fewer days of vacation

leave over that period, four took less than forty days, and two took forty-three days).  Vine and Mehta both testified that it is not generally considered a negative for an associate to take all of their allotted vacation days.  Pl. 56.1 ¶ 187.

Simmons alleges that, in contravention to the informal Akin practice (described by Simmons as a "default rule") by which "an associate who [is first] assigned to a client . . . receive[s] all of the new matters for that client and ke[eps] pending matters, except as needed for vacations or emergencies," Simmons had work assigned to other associates during and after her FMLA leave.  Pl. 56.1 ¶ 197. In support, she points to three examples: (1) a matter reassigned by Tadajweski from Simmons to another associate because the client requested that a more senior associate be placed on the case, <u>see</u> Def. 56.1 ¶ 67, Pl. 56.1 ¶ 68; (2) a matter for a client usually covered by another associate that was reassigned from Simmons back to that associate when he returned from vacation, Pl. 56.1 ¶ 68; and (3) a dormant matter for "Client 031010" on which Simmons had initially worked 3.3 hours, but parts of which were later assigned to Sharifi-Azad, <u>id.</u> ¶¶ 68, 203, 256; <u>see also</u> Defendant's Reply in Support of its Motion for Summary Judgment ("Def. Reply Mem.") at 9 (noting that Simmons billed 275 hours on matters for Client 031010 after her FMLA leave, and handled 10 of the 17 projects it generated).

8

On September 15, 2008, the collapse of the financial services firm Lehman Brothers precipitated a financial crisis with large negative effects on Akin's Investment Funds Practice Group.  Def. 56.1 ¶ 38.  Mehta and Vine soon thereafter became convinced that the size of the IFPG workforce was too large in relation to the work available.  Id.  In October 2008, Akin fired a recently hired white male IFPG associate.  Id. ¶ 40.  On October 26, 2008, Kim Koopersmith, Akin Gump's Managing Partner, contacted Mehta and Vine to find out which associates in the IFPG were not "performing at the necessary level."  Id. ¶ 42.  Mehta responded that three associates in IFPG -- Simmons and two white male associates -- "will receive messages where 'needs improvement' is the strong emphasis."  Id.

In January 2009, Simmons' work performance for 2008 was formally reviewed by three partners of her choosing, including Tadajweski and Lekhel.  See Raskin Aff. at Ex. 26.  There are four ratings a reviewer may choose from for each category of performance: Superior, Right Where Associate Should Be, Needs Development, and No Basis.  Lekhel indicated that Simmons "Needs Development" in four areas: (1) Legal Analysis: Identification of Key Issues; (2) Legal Analysis: Clarity of Reasoning; (3) Writing Ability: Clarity; and (4) Writing Ability: Persuasiveness.  Id. (also commenting that Simmons needs "more analytical and critical thinking, a more direct and pro-active writing style, and [to improve at] proofreading documents").

Another reviewing partner indicated that Simmons "Needs Development" in two other areas: (1) Commitment and Productivity: Works Independently, and (2) Commitment and Productivity: Assumes Responsibility.  Id.  Simmons received "Superiors" in two categories: (1) Dedication to Firm Goals: Involvement in Community Service and Pro Bono Work, and (2) Collegiality: Teamwork, Civility, Mutual Respect.  Id.  Other than one other associate, who was also terminated by Akin in 2009, Simmons received more "Needs Development" ratings than any other associate in the New York IFPG.  Def. 56.1 ¶ 48.  In addition, no other New York IFPG associate received so few "Superior" ratings, and for categories unrelated to substantive legal work.  Id.  Lekhel described her review as "the toughest – like probably the worst review I've given to anyone."  Deposition of Arina Lekhel, dated March 15, 2011 ("Lekhel Dep.") at 232:5-16.

On January 5, 2009, Simmons met with Vine and Tadajweski regarding her performance review.  According to Simmons, Vine stated that Simmons had not made sufficient "progress in getting up the learning curve on the funds practice," that she was "not critical or essential because compared to her peers, she did not have enough clients and was not a point person for enough clients," and that these problems were partially rooted in the fact that she had been "gone a lot."  Pl. 56.1 ¶ 51.  Tadajweski stated in the comments to her review that she was "looking forward to working with [Simmons] on

10

an uninterrupted basis next year" and that "with less time away from the group, [Simmons] will be able to focus on further developing her skills." Raskin Aff. Ex. 26.  On January 6, 2009, Simmons met with Lekhel to discuss her performance evaluation.  According to Simmons, Lekhel expressed at that meeting that it had been difficult to work with Simmons because she had taken so much leave.  Simmons Dep. at 119:11-25.  During her own deposition, Lekhel testified that Simmons' "availability was an issue" given that Simmons requested more days off than other associates, and that if Lekhel were in Simmons' position, she would have taken fewer days off after taking such a lengthy medical leave.  Deposition of Arina Lekhel, dated March 15, 2011 ("Lekhel Dep.") at 245-47.

In February 2009, Akin began a formal firm-wide "reduction in force" ("RIF").  Def. 56.1 ¶ 58.  Vine and Mehta initially selected three associates from the New York IFPG to include in the RIF -- two white males and Simmons.  Id.  Simmons' name was included on that list because of her relatively poor written evaluations and her relative lack of client relationships.  See id. ¶ 72.  However, Vine testified that he removed Simmons from the RIF list because he believed "our treatment of minority and women lawyers ought to [be] give[n] some special consideration."  Deposition of Stephen Vine, dated March 1, 2010, ("Vine Dep.") at 227:4-229:21 (also stating that if Simmons were white she "possibly" would have been terminated

11

pursuant to the RIF).  Koopersmith responded to Vine's revised RIF list by suggesting that Simmons, rather than one of the white male associates, should be considered for termination.  Pl. 56.1 ¶ 59.  However, Koopersmith ultimately acceded to Vine's recommendation that Simmons not be terminated at that time.  Id.

On March 6, 2009, Akin executed its RIF, laying off 47 lawyers, including seven IFPG associates -- five white men, one white woman, and one Asian-American woman.  Def. 56.1 ¶ 60.  However, in April 2009, despite the layoffs, there was still insufficient work in IFPG to "keep[] the associates busy."  Deposition of Prakash Mehta, dated March 4, 2011 ("Mehta Dep.") at 107:7-108:7.  During this time, several IFPG partners expressed concern about the retention of their own jobs.  See, e.g., id. 266:18-267:12 Lekhel Dep. 57:15-20.  On April 6, 2009, Akin Gump announced that it was deferring start dates for incoming IFPG associates until March 2010.  Def. 56.1 ¶ 62.  Also in April 2009, a white male associate and an African-American female associate in the firm's IFPG were terminated, allegedly for performance reasons.  Pl. 56.1 ¶ 57.  Soon thereafter, in June 2009, Akin decided to terminate a white male associate in the IFPG and retain him on an hourly basis (for which he only earned $600 in total over both 2009 and 2010).  Def. 56.1 ¶ 66.  Also in June 2009, the firm announced that it was freezing all associate salaries, with the firm's Chairman singling out the IFPG as "really lagging in terms of

billable hours." <u>Id.</u> ¶ 64; Pl. 56.1 ¶ 314.  Total IFPG revenue fell from roughly $62.6 million in 2007 to $47.2 million in 2009, a 26% drop; average IFPG attorney billable hours fell from 2,051 to 1,651. Def. 56.1 ¶ 82.

In September 2009, citing continuing difficulties in the IFPG, Vine and Mehta decided to terminate Simmons.  Vine stated that, had the financial crisis not happened, "it's unlikely that [Simmons] would have been fired," Vine Dep. 252:18-253:7, and Mehta stated that while the decision to terminate Simmons was primarily "an economic decision . . .[,] in arriving at the list of people who were terminated and might be terminated, performance was evaluated," Mehta Dep. 92:16-23.  On September 17, 2009, Mehta met with Simmons to inform her that she was being terminated for economic reasons, but that she could remain at the firm until the end of the year.  Def. 56.1 ¶ 75.  Simmons asked why she was "the expendable employee," to which Mehta responded that she had fewer clients and connections than the remaining IFPG associates.  Pl. 56.1 ¶ 75.

Akin's New York IFPG did not hire, recruit, or make any offers to associates throughout the entirety of 2010 -- though it did allow two first-year associates, to whom it had previously extended offers and deferred, to begin working at the firm on a permanent basis.  Pl. 56.1 ¶ 78.  In February and May 2010, two white associates in the New York IFPG left Akin Gump voluntarily.  Def.

56.1 ¶ 79.  In February 2010, at Hsu's urging, the firm rehired a white male associate as a staff attorney because he had previously worked on a matter that had became unexpectedly busy.  This associate was terminated again in December 2010.  Id. ¶ 82.  As a result of all these terminations, the percentage of African American associates at Akin fell from 4% (5 of 123 associates) in 2008 to 1.3% (1 of 76 associates) in 2010.  Pl. 56.1 ¶¶ 330-332.

Separately, throughout much of 2008, Simmons intended to move to Washington DC, a fact she conveyed to Tadajweski.  Pl. 56.1 ¶ 31.  Later in the year, however, Simmons told her friends and family that she had decided to postpone a move for the time being.  Id. ¶ 37.  No IFPG members transferred from New York to Washington DC during Simmons' time at Akin.  Def. 56.1 ¶ 75.  However, both before and after Simmons' termination, several IFPG partners and associates, including IFPG co-chair Mehta, transferred from other offices to New York.  Id. ¶ 80; Pl. 56.1 ¶ 8.

Against this background, the Court turns first to Simmons' claims for race discrimination.[2]  Where, as here, there is no direct

---

[2] Simmons asserts four separate claims for race discrimination, under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Count 1), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Count 3), the New York State Executive Law § 296 et seq. (Count 5), and the Administrative Code of the City of New York § 8-101 et seq. (Count 7).  Although there are some differences between these laws, nonetheless, as far as the issues presented in this matter are concerned, the same standards apply, see, e.g., James v. N.Y. Racing Assoc., 233 F.3d 149, 153 (2d Cir. 2000), and, accordingly, they will not be discussed separately here.

evidence of discrimination, claims of discriminatory treatment are analyzed under the framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Under McDonnell Douglas, the plaintiff first bears the threshold burden of coming forward with evidence demonstrating a prima facie case of discrimination.  Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 142 (2000).  This entails showing, inter alia, that the adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of plaintiff's membership in a protected class.  Ruiz v. County of Rockland, 609 F.3d 486, 491-92 (2d Cir. 2010).  If plaintiff has established a prima facie case of discrimination, the defendant must then "articulate some legitimate, non-discriminatory reason for the termination."  Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004).  Once the employer has done so, the burden reverts to plaintiff to prove, by a preponderance of evidence, that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id.

Here, the Court concludes that Simmons has failed, at a minimum, to show that her firing was based on anything but the firm's dire financial situation.  See Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009).  It is undisputed that, in 2009, at the height of the financial crisis, Akin was going through severe financial turmoil,

firing dozens of attorneys, pushing back start dates for incoming associates, and instituting a firm-wide salary freeze. Simmons' practice group, with its focus on investment funds, was hit especially hard during this time, with revenue decreasing a dramatic 26% between 2008 and 2009. Def. 56.1 ¶ 83. As a predictable result, in 2009, Akin terminated eleven IFPG associates, nine of whom were outside Simmons' protected class. Pl. 56.1 ¶ 272. In addition, the undisputed evidence indicates that Simmons' work performance was, at best, mediocre. For example, her written performance reviews for the preceding year were, by many metrics, the worst among the associates in the New York IFPG. See Raskin Aff. Ex. 26-27; Def. 56.1 ¶ 48; Pl. 56.1 ¶ 212. Moreover, several of Simmons' supervisors contemporaneously complained of deficiencies in her work. See Def. 56.1 ¶¶ 15, 23, 28, 42, 54. Finally, the same individuals, Vine and Mehta, made both the decision to hire Simmons in June 2007 and the decision to terminate her in September 2009. See Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997) (holding that, pursuant to "the same actor inference," when "the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation" for the termination decision).

Given these glaring circumstances, no reasonable juror could infer that Akin's decision to terminate Simmons was based, in any

material respect, on racial discrimination.  Indeed, it is undisputed

that Simmons would likely have been terminated six months earlier,

pursuant to the March 2009 RIF, if it were not for Vine and Mehta's

belief that "minority and women lawyers ought to [be] give[n] some

special consideration."[3]  Vine Dep. at 227:4-229:21.  Moreover, with

respect to the various "negative" incidents of which Simmons

complains --such as her assignment to work for the "notoriously

difficult" Gorman-Evans, see Pl. 56.1 at 40, the alleged inadequacy

of the informal training opportunities available to her at Akin, and

her inability to transfer offices from New York to Washington, DC --

Simmons has failed to adduce any evidence from which a reasonable

juror could infer that any of these circumstances was unique to

Simmons or in any way connected with her race.

Accordingly, the Court concludes that Simmons' claims for

race discrimination must be dismissed.

Next, the Court turns to Simmons' only remaining claim --

that Akin retaliated against her because Simmons invoked her right to

---

[3] Simmons contends, somewhat incredibly, that the fact that she
received race-based preferential treatment from Akin prior to her
termination is somehow indicative of "bias" because it reflects
Akin's "de-legitimiz[ing] . . . fixation on race."  See Plaintiff's
Memorandum of Law in Opposition to Defendant's Motion for Summary
Judgment at 10-11.  The Court finds this argument unconvincing.
While the argument that race-based preferential treatment programs
may have unintended negative consequences for their intended
beneficiaries is not without force, it would be truly perverse if an
organization's history of affording preferential treatment to racial
minorities could be used by civil rights plaintiffs to support their
claims of racial discrimination.

take leave under the FMLA (Count 9).  In order to make out such a
claim, Simmons must show that "1)[s]he exercised rights protected
under the FMLA; 2) [s]he was qualified for [her] position; 3) [s]he
suffered an adverse employment action; and 4) the adverse employment
action occurred under circumstances giving rise to an inference of
retaliatory intent."  Potenza v. City of New York, 365 F.3d 165, 168
(2d Cir. 2004).  Assuming arguendo that Simmons meets the first three
prongs, her claim fails on the fourth prong because the circumstances
here do not give rise to an inference of retaliatory intent.

     Simmons contends that her supervisors at Akin expressed
"their negative view of Simmons' FMLA leave."  Pl Mem. at 24.  In
support, Simmons points primarily to her January 2009 oral
performance review, in which Vine and Tadajweski both suggested she
had taken too much time out of the office, concerns that were
reiterated in a follow-up meeting with Lekhel.  See Pl. 56.1 ¶¶ 193-
96.  Simmons further contends that, even though Akin operated under a
"default rule" by which the first associate assigned to a matter
received all related assignments, this "rule" no longer applied to
her after her FMLA leave.  Pl. 56.1 ¶ 197.

     The Court concludes, however, that the foregoing is
insufficient to support Simmons' claim for FMLA retaliation.  As an
initial matter, Akin allowed Simmons to take FMLA leave, paid her for
each day she was out on leave, adjusted her billable hour

expectations in proportion to the length of her leave, and arranged

to have work waiting for her upon her return.  See Def. 56.1 ¶¶ 34,

56.  Thereafter, no adverse action was taken that even remotely

related to this leave.  Nothing about the reassignments -- even

assuming arguendo they could be viewed as legally cognizable "adverse

actions" under the FLMA -- suggests they were in any respect

motivated by retaliation.  The first reassignment occurred after the

client explicitly requested a more senior attorney be assigned to the

case; the second occurred when the original attorney to whom the

project had been assigned returned from vacation; and the third

occurred with respect to a matter on which Simmons had only billed

3.3 hours before she left for FMLA leave and on which, after she

returned from her leave, she was assigned ten of the seventeen

projects it generated. As to the comments Simmons received in her

January 2009 performance reviews regarding the amount of time she had

been out of the office, the undisputed evidence shows that Simmons

took more days of leave classified as "vacation" than any other

associate in IFPG between 2007 and 2009.  See Raskin Aff. Ex. 16.  In

light of that fact, the Court concludes that Vine's comment that

Simmons had been "gone a lot," see Pl. 56.1 ¶ 230, and Tadajweski's

comment she was "look[ing] forward to working with [Simmons] on an

uninterrupted basis next year," see Pl. 56.1 ¶ 218, do not support an

inference that Simmons' termination was in any way connected to her

taking FMLA leave.  Instead, the only plausible inference, if any,

that a reasonable juror might draw from the juxtaposition of such

comments alongside Simmons' negative performance reviews -- in which

she received the lowest possible rating from her reviewers in

categories such as "Legal Analysis: Identification of Key Issues,"

"Legal Analysis: Clarity of Legal Reasoning," "Writing Ability:

Clarity," and "Writing Ability: Persuasiveness," see Raskin Aff. Ex.

26 -- is that, rather than indicative of FMLA retaliation, Vine and

Tadajweski's comments were directed toward softening the blow of what

Lekhel characterized as "the worst review [she'd] given to anyone,"

see Lekhel Dep. at 232:5-16.

Finally, the Court notes that Mehta and Vines decided to

terminate Simmons over a year after she returned from her FMLA leave,

roughly nine months after her January 2009 performance review, and

roughly six months after they had explicitly taken her name off the

list of associates to be terminated under the firm's RIF.  Quite

aside from the overwhelming proof that Simmons was terminated for

economic reasons, see supra, this timeline indicates that Akin's

decision to terminate Simmons was not in any way related to her

taking FMLA leave.  See O'Reilly v. Consolidated Edison Co. of New

York, Inc., 173 Fed. Appx. 20, 22 (2d Cir. 2006) (holding that a

"three month gap between [the plaintiff's] FMLA leave and her

20

termination is not sufficient to give rise to an inference of
retaliation").

The Court has considered all of Simmons' additional arguments
and finds them without merit.  Accordingly, the Court hereby
reaffirms its Order dated May 30, 2011 granting defendant's motion
for summary judgment and dismissing the Amended Complaint in its
entirety, with prejudice.  Clerk to enter judgment.

SO ORDERED.

Dated: New York, NY
October 5, 2011                    _____
                                  JED S. RAKOFF, U.S.D.J.

21